Robert L. DOWELL, an infant, who sues
by A. L. Dowell, his father and next
of friend, Plaintiff,

v.

The SCHOOL BOARD OF the OKLA-
HOMA CITY PUBLIC SCHOOLS,
et al., Defendants.

Civ. No. 9452.

United States District Court
W. D. Oklahoma.

July 11, 1963.

U. Simpson Tate, Wewoka, Okl., and
E. Melvin Porter, Oklahoma City, Okl.,

for plaintiff. John Green, Oklahoma City, Okl. (now Asst. U. S. Atty.), was originally one of attorneys for plaintiff.

Walter A. Lybrand and Max G. Morgan, Oklahoma City, Okl., for defendants.

BOHANON, District Judge.

The plaintiff, Robert L. Dowell, a Negro minor, brings this action through his father and next of friend, Dr. A. L. Dowell, alleging that they, and the members of the class of persons whom they represent who are similarly situated because of their race and color, are members of the Negro race as defined by Article XIII, Section 3, Constitution of Oklahoma, and Title 70, Oklahoma Statutes, Section 5-2, Oklahoma School Code. That the Board of Education is a body corporate, made so by the laws of Oklahoma, Title 70, O.S. Section 4-5. The jurisdiction of the Court is invoked pursuant to the provisions of Title 28 United States Code Section 1343(3), being a suit in equity authorized by law, Title 42 United States Code Section 1983, and is being brought to redress the deprivation under color of law, statutes, regulations, customs and usages of a state of rights, privileges and immunities secured by the Constitution and the laws of the United States. Further jurisdiction of the Court is invoked by Title 28 United States Code Sections 2281 and 2284, being a civil action for a permanent injunction to enjoin and restrain the enforcement, operation and execution of state statutes by restraining and permanently enjoining the defendants respectively as Superintendent and Assistant Superintendent, Members of the School Board of Oklahoma City, and agents of the State of Oklahoma, from enforcing such statutes and from promulgating or enforcing any order made by them, or any of them, pursuant thereto. The rights sought to be secured by this action are the rights guaranteed by due process and equal protection clause of the 14th Amendment, Section 1, of the United States Constitution and rights protected by the provisions of Title 42 of the United States Code Sections 1981 and 1983, and the plaintiffs have been and are now and are threatened to be denied rights by the state as are enjoyed by white citizens similarly situated. That a statutory three-Judge Court be assembled and that upon the trial hereof the Court issue an order, judgment and decree that will declare the provisions of Section 5, Article I, Constitution of Oklahoma, and statutes requiring segregation, unconstitutional and void. That the defendants, and each of them, be permanently enjoined and restrained from operating and maintaining a dual, biracial system of racially segregated schools, and from promulgating, issuing and enforcing against this minor plaintiff and any member of the class of persons he represents who are similarly situated because of race or color, any rule or regulation that will deny him or them the right to admission to public schools within the defendant school district on the same basis as if they were members of the white race.

To this charge the defendants specifically deny that any act of any defendant toward or in connection with the minor plaintiff or any other pupil has been done on a discriminatory basis of race or color, contrary to the provisions of the Constitution or the laws of the United States, or that the defendants, or either of them, have acted under any unlawful policy, practice, custom or usage of making assignments to schools within defendants' school district or any thing to or in regard to any pupil for the purpose of resorting, instituting or perpetuating the unlawful practice of racial segregation in the schools under the control of the defendants or unlawfully deny any pupil any right because of said pupil's race or color. That the defendants agree that the Oklahoma Constitutional provisions and statutory provisions complained of by the plaintiff are unconstitutional and void and that the defendants have not operated under the provisions thereof, and deny that under the facts and the law the convening of a three-Judge Court as prayed for by the plaintiffs is proper.

Judge A. P. Murrah, Chief Judge of the United States Court of Appeals, Tenth Circuit, on the 11th day of Octo-

ber, 1961, did constitute a three-Judge Court composed of Chief Judge A. P. Murrah, of the Tenth Circuit Court of Appeals, the Honorable Luther Bohanon, and the Honorable Fred Daugherty, Judges of the Eastern, Western and Northern Districts of the State of Oklahoma.

On the 3rd day of April, 1962, the three-Judge Court, duly assembled, did hear testimony and evidence concerning this action. Thereafter, and on the 10th day of July, 1962, the Court entered its Order Dissolving the three-Judge Court, saying:

"The real question posed by the pleadings is the application by the defendant of Section 4–22 of Title 70, Oklahoma Statutes. The plaintiff admits that this section is constitutional on its face but contends that it is unconstitutionally applied. To which the defendant states that all actions taken by them are under the authority of this statute only and that it is not being and has not been unconstitutionally applied. The evidence shows that the plaintiff comes from a dependent school district where there is no high school, into the defendants' school district, and made his election to attend Douglass High School. After attending Douglass High School for one year, he then made application to be transferred from Douglass High School to Northeast High School because a course of study offered at Northeast High School was not available at Douglass High School, and this transfer was permitted on the condition that the plaintiff enroll in the course of study and diligently pursue the same. The evidence failed to show that the above mentioned statute is or was unconstitutionally applied by the defendants."

Saying further:

"It is always the duty of any Court to inquire into its jurisdiction * * and in view of what has been set forth this Court holds that it is without jurisdiction, and is of the opinion that the subject matter of this lawsuit is properly one for determination by one Judge. The case having been originally assigned to Honorable Luther Bohanon, District Judge, it is hereby re-assigned to him for further proceedings, and this three-Judge statutory Court is hereby dissolved."

The records disclose that numerous motions were filed by the parties, hearings and pretrial conferences conducted, and the Court granted other persons the right to intervene, namely, Edwina Houston and Gary Russell, and on the 6th day of March, 1963, a final Pretrial Order was made, wherein the issues to be tried were defined generally as follows:

1. PLAINTIFFS' ISSUES AND CONTENTIONS shall be:

   I. That defendants have adopted and are enforcing a student transfer policy that discriminates against plaintiffs and the class of persons that they represent on the basis of their race.

   II. That Negro pupils who seek transfers from the Douglass High School to other high schools within the Oklahoma City School District meet and are faced with conditions and limitations that are not met and faced by white pupils within the school district who seek transfers to the same school or schools from the attendance area in which they live.

   III. That the plaintiffs Robert L. Dowell and Vivian Dowell, his sister, and Edwina Houston and Gary Russell, were discriminated against unlawfully by having had to meet and

face these conditions and limitations, when they sought to transfer from one school to another.

IV. That Negro pupils meet and are faced with a different set of conditions and limitations when they seek to transfer from a school in which their race is in the minority to one where their race is in the majority than they meet and face when they seek to transfer from a school in which their race is in the majority to one where their race is in the minority.

V. That principals, teachers, clerical, administrative, supervisory, custodial and maintenance employees are assigned to buildings and class rooms on the basis of their race and the race of the students that constitute the majority of the student body of the school or schools to which assignments are made.

VI. That the Douglass High School attendance area has been gerrymandered so as to include a disproportionate number of Negro high school pupils, and to include a "feeder" Junior High School and all or most of the elementary schools at which Negro children constitute a racial majority in the attendance area.

2. PATTERNS OF RACIAL DISCRIMINATION as evidence of the practice:

I. Inequities in transfer policy as applied;

II. The number of segregated school buildings with completely racially segregated faculty, staff and student bodies;

III. The number of Negro children attending schools with integrated faculties, staffs and student bodies;

IV. The extent of racial segregation in curricular and extra-curricular activities;

V. The practice of operating racially segregated school busses over the same or substantially the same routes.

VI. That the defendant board of education has no plan for the furtherance of integration or desegregation.

3. DEFENDANTS' ISSUES AND CONTENTIONS SHALL BE:

I. STIPULATION: On Policy—

"It is stipulated and agreed by and between the parties hereto by their respective counsel that it is the policy of the Board of Education of the Oklahoma City Public Schools, Independent School District No. 89, Oklahoma County, Oklahoma, that it is the policy of the said school board to consider, pass upon and to practically always grant the applications of parents for the transfer of their children from schools where the children's race is in the minority to a school or schools solely of the child's race or in which the child's race is in the majority."

II. They will contend that this is not racial segregation and that it does not infringe the constitutional rights of any child.

III. That by their Resolution of 1955, the Board attained complete desegregation and that having done this it is neither necessary nor proper for the Board to have or now present a plan for desegregation.

IV. They will deny that there has been any gerrymandering in the laying out of, or defining, limiting or delimiting of school attendance areas.

V. They will contend that they have not granted transfers on the basis of race and they will contend that race must be taken into consideration in making transfers because race is always there.

VI. They will contend that the evidence introduced shows that the defendants have complied with the Brown desegregation decision by abolishing segregation in the defendant schools in 1955, and therefore they are denying no one any constitutional right and the burden is now on plaintiffs to overcome this showing and further to prove facts showing defendants now, at this time, are committing acts intended to or which do restore the defendants' schools to the status of segregated schools, or are intended to, or do, deprive some person wrongfully of a constitutional right.

4. TESTIMONY AND EXHIBITS.

I. All testimony, exhibits and stipulations previously heard and entered herein may be used as part of the record, in whole or in part and the parties may call such additional witnesses as may give relevant and material evidence in support of the issues here involved.

II. Any document, paper, letter, report, or directive made by the defendant Board of Education is admissible herein upon proper verification or by photographic copy.

On the 10th day of May, 1963, the Court began the hearing of testimony and evidence, which will be hereinafter treated at length. However, at this point, the Court should take some time to explain the factual circumstances surrounding segregation. It should be remembered that Oklahoma was admitted into the Union in 1907 as what is commonly known and called a "Jim Crow State," being an expression having to do with the law that was common among southern states requiring the separation of white and Negro people in public vehicles and places of resort, and at all times since Statehood the Oklahoma School District was completely and fully segregated. The Constitution of Oklahoma, Article XIII, Section 3, reads:

"Separate schools for white and colored children.—Separate schools for white and colored children with like accommodation shall be provided by the Legislature and impartially maintained. The term 'colored children,' as used in this section, shall be construed to mean children of African descent. The term 'white children' shall include all other children."

The Legislature implemented the above provision of the Constitution with the following legislative provisions:

TITLE 70, O. S.

"§ 5–1. Separation of races—Impartial facilities.—The public schools of the State of Oklahoma shall be organized and maintained upon a complete plan of separation

between the white and colored races with impartial facilities for both races."

"§ 5-2. Definitions.—The term 'colored,' as used in the preceding section, shall be construed to mean all persons of African descent who possess any quantum of negro blood, and the term 'white' shall include all other persons. The term 'public school' within the meaning of this Article shall include all schools provided for or maintained, in whole or in part, at public expense."

"§ 5-3. Separate school defined—Designation—Membership of district board.—The separate school in each district is hereby declared to be that school in said school district of the race having the fewest number of children in said district. Provided, that the county superintendent of schools shall have authority to designate what school or schools in the school district shall be the separate school or schools and which class of children, either white or colored, shall have the privilege of attending such separate school or schools in said school district. Members of the district school board shall be of the same race as the children who are entitled to attend the school of the district, not the separate school."

"§ 5-4. Teacher permitting child to attend school of other race.—Any teacher in this State who shall willfully and knowingly allow any child of the colored race to attend the school maintained for the white race or allow any white child to attend the school maintained for the colored race shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not less than ten dollars ($10.00) nor more than fifty dollars ($50.00), and his certificate shall be cancelled and he shall not have another issued to him for a term of one (1) year."

"§ 5-5. Maintaining or operating institution for both races.—It shall be unlawful for any person, corporation or association of persons to maintain or operate any college, school or institution of this State where persons of both white and colored races are received as pupils for instruction, and any person or corporation who shall operate or maintain any such college, school, or institution in violation hereof shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined not less than one hundred dollars ($100.00) nor more than five hundred dollars ($500.00), and each day such school, college or institution shall be open and maintained shall be deemed a separate offense."

"§ 5-6. Teaching an institution receiving both races.—Any instructor who shall teach in any school, college or institution where members of the white and colored race are received and enrolled as pupils for instruction shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be fined in any sum not less than ten dollars ($10.00) nor more than fifty dollars ($50.00) for each offense, and each day any instructor shall continue to teach in any such college, school or institution shall be considered a separate offense."

"§ 5-7. White person attending institution receiving colored pupils.—It shall be unlawful for any white person to attend any school, college, or institution where colored persons are received as pupils for instruction, and anyone so offending shall be fined not less than five dollars ($5.00) nor more than twenty ($20.00) for each offense, and each day such person so offends as herein provided shall be deemed a distinct and separate offense: Provided nothing in this Article shall be construed as to prevent any private school, college or institution of learning from maintaining a separate or distinct branch thereof in a different locality."

"§ 5–8. Support and maintenance of separate schools.—The annual budget of each school district maintaining separate schools for white and colored children shall provide for the support and maintenance of both the school or schools for the white children and the school or schools for the colored children."

"§ 5–11. Transfer of pupils.— When any school district having both white and colored children of school age does not maintain schools for both races, the county superintendent of schools shall transfer the children of the race for which a school is not maintained to a school of their own color in another district when the same can be done with the consent of their parents, guardians, or custodians, or without such consent when such children can be transferred without compelling them to walk more than one and one-half (1½) miles to attend such school; provided, that such children may be required to travel more than one and one-half (1½) miles when proper provision is made for the transportation of such children, and the consent of the parents, guardian, or custodian of any child being required to travel more than one and one-half (1½) miles shall not be required when such transportation is furnished."

The foregoing Oklahoma Constitutional provision and statutory provisions are unconstitutional, null and void, and are unenforceable. Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (May 17, 1954). And such laws shall not be used in the future in any degree to form the basis of any school policy or operation, nor shall the custom and tradition created out of the use of these unconstitutional laws form the basis of any policy or the operations of the defendant school system.

In addition to the quoted laws demanding and providing for segregation, when new additions were added to the cities and towns of Oklahoma, it was generally the practice of the developers to provide in the plats restrictive covenants on lands used for new homes or dwelling places, prohibiting the sale of lands or lots or the ownership by persons of the Negro race. These restrictive covenants also generally provided some penalty for an attempt to violate them. In the case where lands or lots were sold at a tax sale in Oklahoma, these restrictive covenants survive the sale. 68 O.S.A. Section 456 in part provides:

"Whenever in any incorporated city or town, or addition or subdivision thereto or thereof a deed in the chain of title shall contain restrictions and covenants running with the land * * * said restrictions and covenants shall survive and be enforceable after the issuance of a resale or certificate tax deed * * *."

Since Shelley et ux v. Kraemer, et ux, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161, and Hurd v. Hodge, 334 U.S. 24, 68 S.Ct. 847, 92 L.Ed. 1187, these restrictive covenants have been unenforceable in the Courts. These cases in effect hold that such restrictive covenants based on race or color standing alone do not violate the 14th Amendment so long as the purposes of the covenants are effectuated by voluntary adherence thereto, but that it is a violation of the equal protection clause of the 14th Amendment for State Courts to enforce the same. Oklahoma now, of course, follows this rule; Correll v. Earley, 205 Okl. 366, 237 P.2d 1017.

Thus one of the barriers to Negroes owning property anywhere in the city has been eliminated.

The residential pattern of the white and Negro people in the Oklahoma City school district has been set by law for a period in excess of fifty years, and residential pattern has much to do with the segregation of the races. To understand the situation more clearly, it must be pointed out that the east and southeast portion of the original City of Oklahoma City was Negro, and all other sections and districts of the original city of Oklahoma City were occupied by the white race. Thus the schools for Negroes have

been centrally located in the Negro section of Oklahoma City, comprising generally the central east section of the City. Following the United States Supreme Court decision of Brown v. Board of Education of Topeka, Kansas, May 17, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, and Brown v. Board of Education of Topeka, Opinion and Judgment announced May 31, 1955, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, the Oklahoma School Board for the first time was confronted with the duty of desegregating the segregated policy of law, of custom and tradition for a period of fifty years.

The problem confronting the Oklahoma City School Board was one of long standing, requiring a complete disregard of the old, unjust and unreasonable laws relating to the rights of the Negro citizens. The patrons of the School District had lived under a dual school system and the children's residential areas were fixed by custom, tradition, restrictive covenants and laws. The Negro people had been segregated so completely in their residential pattern that it was difficult to determine what way, method and plan would be first adopted and carried out and what progressive plans should be adopted and carried out in the future. The Negroes of the Oklahoma City School District had before them a new day—new rights which had for years been denied them—new hopes and new expectations. The Negroes lived in great anticipation of mixed schools of Negroes and whites, to the extent that the Negro race will be considered equal in all things and in all manners to the white race with reference to the education of children.

The first tangible evidence was the Resolution passed by the Oklahoma City School Board on August 1, 1955, which reads as follows:

"It was moved by Mr. McCoy and seconded by Mr. Thompson to approve the adoption of the following policy concerning integration and make it a matter of record. Motion carried on roll call, and all members voted Yea."

"Statement Concerning Integration
"Oklahoma Public Schools
"1955–1956
"August 1, 1955

"All will recognize the difficulties the Board of Education has met in complying wtih the recent pronouncement of the United States Supreme Court in regard to discontinuing separate schools for white and Negro children. The Board of Education asks the cooperation and patience of our citizens in its compliance with the law and making the changes that are necessary and advisable. This action requires the Oklahoma Board of Education to change a system which has been in effect for centuries and which is desired for many of our citizens.

"Boundaries have been established for all schools. These boundaries are shown on a map at the City Administration Building and maps are being distributed to each school principal. These new boundaries conform to the policies always followed in establishing school boundaries. They consider natural geographical boundaries, such as major traffic streets, railroads, the river, etc. They consider the capacity of the school. Any child may continue in the school where he has been attending until graduation from that school. Requests for transfers may be made and each one shall be considered on its merits and within the respective capacity of the buildings."

Otherwise the record is void of any tangible evidence of any other action, in writing or oral, the School Board has taken to integrate the public schools of Oklahoma City. At the time of the foregoing resolution, certain new school boundaries were established. Many white families moved out of the east central area and many Negro families moved in to the area. The white families who remained in the area were permitted to transfer their children from their school attendance areas because of the Negro race to areas where the white

race was predominant. The Court has searched the record carefully and finds no tangible evidence to show the defendants have made a good faith effort to integrate the public schools of Oklahoma City beyond the August 1, 1955 resolution, notwithstanding eight years have now passed, which is more time than necessary within which to begin to adjust the inequities which have existed unnecessarily so long, and the record is void of any evidence to indicate that the defendant School Board will make any improvement in the future. The Court recognizes that about the year 1955 there was permitted inter-school athletic activities without regard to race.

The testimony shows that Dr. Dowell, the father of Robert Dowell, prior to 1959, lived in the Oklahoma City School District. Thereafter he moved to 2700 North Bryant, which is across the street from the Oklahoma City School District, otherwise known as Independent School District No. 89. At his new address he was in a Dependent School District, known as D-45, and by reason of his change in residence his elementary school became the Pleasant Hill School District, which was an integrated school. Robert Dowell became eligible for high school studies, filed his application with the Oklahoma County Superintendent of Schools for a transfer to high school in the Oklahoma City School District Independent No. 89. Under Oklahoma Statutes a parent living in a dependent school district need only file an application with the County Superintendent setting forth that in his district there are no high schools. The County Superintendent then certifies the child of the parent to an independent school district, and in this case it was the Oklahoma City School District No. I-89, and by law the child is entitled to go to a high school in the independent school district. In this case the transfer was made and Robert Dowell enrolled for the year 1960–61 in Douglass High School, which is a totally segregated high school having an attendance of approximately 1800 students, located in east central Oklahoma City. Dr. A. L.

Dowell testified that he made no election for his son to go to Douglass High School but that he was sent to Douglass by the Oklahoma City School Board. The Oklahoma City School Board authorities testified that Robert Dowell made a choice and election to go to Douglass High School for the year 1960–61. In May 1961 Dr. A. L. Dowell made application to the County Superintendent that his son be transferred to the Oklahoma City School District for the year 1961-62, which application was granted by the Oklahoma County Superintendent, and thereafter called upon the Assistant Superintendent of Schools, M. J. Burr, requesting permission for his son, Robert Dowell, to attend Northeast High School, stating that it was a better school than Douglass High School and that other Negro children from Pleasant Hill School District and white children from Pleasant Hill School District had been permitted to go to Northeast High School during the year 1960–61, and that his son should have the same privilege. The Assistant Superintendent, M. J. Burr, declined the application, saying the request was without merit. Thereafter Dr. Dowell and his attorney appeared before the Superintendent of Schools, Dr. Jack Parker, and explained and urged his request for his son to attend Northeast High School during the year 1961–62, and after a considerable discussion Dr. Jack Parker suggested that if Robert Dowell would take an electronics course of study offered at Northeast and not offered at Douglass, this could form a basis upon which a transfer could rightfully be made, and Dr. Dowell was invited to appear before the School Board and present his request, which on September 5, 1961, Dr. Dowell and his attorney did appear before the School Board and explained the desire to have the son enrolled in Northeast High School. After a considerable discussion the Oklahoma City School Board went on record concerning the special transfer of Robert Dowell and on that day passed the following motion:

"Mr. John Green, attorney, and Dr. Alfonzo L. Dowell, a resident of

Pleasant Hill School District, appeared before the Board and discussed the transfer situation of Dr. Dowell's two children. The Board indicated that the transfer situation of the 7th grade girl was settled by precedent and by statute.

"It was moved by Mr. Thompson and seconded by Mrs. Welch that if the boy enrolled in the electronics course and continued to pursue it diligently, he can go to Northeast High School. Upon roll call, all members present voted Yea."

In due time young Robert Dowell appeared before Lederle J. Scott, principal of Northeast High School, and was prepared to enroll. Mr. Scott painted a very dark and doubtful picture to young Dowell with reference to enrolling in an electronics course and pointed out many hazards that might befall him should he undertake the course. Generally the discussion was such as to put fear into Robert Dowell as to the wisdom of taking the course and so enrolling. The evidence indicates that the young boy had the feeling of regardless of how hard he worked he would be met with reprisals to the extent that he should not undertake to enroll in Northeast High School, and after his conference with Mr. Scott he temporarily abandoned his desire to go to Northeast High School but instead enrolled in Bishop McGuiness High School, a Catholic High School in north central Oklahoma City. The boy did want to enroll at Northeast and be excused from taking the course in electronics, but was not permitted to do so. Thereafter this lawsuit was instituted on the 9th day of October, 1961.

Mr. Scott testified that M. J. Burr, Assistant Superintendent of Schools, was in Charge of Research and Statistics under the direction of the Board of Education and that students coming from outside the district, such as Pleasant Hill School District, the determination as to what school the boy should attend is made by Mr. Burr, and it is he who determines who will attend Northeast High School or any other school. That it is Mr. Burr who makes up a list of children from dependent school districts and assigns the students to the schools he deems most appropriate for the student. Mr. Scott testified that there were at that time 45 Negroes at Northeast High School. There was a total enrollment of 1,215 in Northeast High School. That John Mike Jones and James Robert Trotter were enrolled in Northeast High School and that they were both from Pleasant Hill Dependent School District, and that they attended Northeast High School without being required to take electronics. That there were at that time 260 legally transferred students attending Northeast High School from other dependent school districts, such as Pleasant Hill District, who were not required to take electronics or other special courses.

The record is clear that young Robert Dowell attended Douglass High School during the school year 1960–61, and the Court finds that such attendance was from an assignment made by M. J. Burr, assigning young Robert Dowell to Douglass High School as the school he most probably would attend. That no oral or written information was ever given to Robert Dowell or his parents that if Robert Dowell enrolled in Douglass High School that would become his permanent high school home, and that he could not transfer therefrom without a scholastic transfer reason. The transfer problem confronting Robert Dowell is not a written policy of the School Board, and is one based upon special usage by the School Board.

Mr. M. J. Burr, Assistant Superintendent of Oklahoma City Schools, testified:

"Q How many special transfers does your office handle in your district each year, approximately?

"A I'd have to guess at it, sir. I imagine around four to five thousand.

"It probably started back years ago. I don't know when. But these students normally en-

roll at a school adjoining them or nearest them, or their choice, so to speak, and we do not assign these children to a school. We merely notify the school that this child has been legally transferred by the County Superintendent and therefore is eligible to attend the Oklahoma City Public Schools, and is eligible to attend this particular school.

\* \* \* \* \* \*

"Now normally the students that live out west will present themselves to Northwest. Those at Millwood would present themselves to Harding or Northeast; those from Harrison always present themselves to Douglass.

"So we send a list of legal transfers that has been approved by the County Superintendent's office to the schools that we think they will probably appear.

"Now not knowing where they are going to be, it is not unusual at all for us to have a call from a principal and say that a certain student has appeared, stating that they are out of the district and wanting to know if they have been legally transferred. We look at our list from the County Superintendent's office and report 'Yes, they have been transferred. It's okay to enroll them.' And it is not an assignment. It's merely a permissive statement from our office that they are eligible to enroll in the Oklahoma City Public Schools. \* \* \*"

Plaintiff submitted interrogatories to Dr. Jack F. Parker, Superintendent of the Oklahoma City School Board, which gave the following pertinent data:

The number of school buildings in the Oklahoma City School District that had all-Negro enrollments for the school years:

|  | 1954–55 and | 1961–62 |
|---|---|---|
| Elementary | 9 | 11 |
| Junior High | 1 | 1 |
| Senior High | 1 | 1 |

The number of school buildings in the Oklahoma City School District that had all-White enrollments for the school years:

|  | 1954–55 and | 1961–62 |
|---|---|---|
| Elementary | 68 | 65 |
| Junior High | 7 | 5 |
| Senior High | 7 | 7 |

The number of Negro students that attended public schools under Dr. Parker's supervision and control that had racially integrated student bodies for the school years:

|  | 1954–55 and | 1961–62 |
|---|---|---|
| Elementary |  | 733 |
| Junior High | 0 | 470 |
| Senior High | | |

That the number of white high school transfer students out of the Douglass High School area for the school year 1962–63 were 98 and the Negro transfers out of other high school areas to the Douglass High School was 11, or a total of 109. The transfer of white children from elementary schools living in the Douglass area to white schools was 168. There were no white students of high school age and grade who lived in the Douglass High School area that attended Douglass High School for the years 1954–55 through and including the year 1962–63.

In the school year 1954–55 there were 5,477 Negroes attending only Negro schools and 45,778 white students attending only white schools, and in the school year 1961–62 there were 8,939 Negro students attending only Negro schools and the same year there were 54,299 white students attending only white schools. During the school year 1954–55 there were no Negro teachers assigned to teach white students in the white schools or white and Negro schools

438

where the white students were predominant and the same was true for the year 1961–62 and all years in between. In the year 1955–56 no white teachers were assigned to teach in schools where a majority of the students were Negroes. However, as an example, Lincoln Elementary School, after the Resolution of August 1, 1955, and the re-districting of that school area, became a predominantly Negro school body with white principal and white teachers, and for a period of eight years this school has been supervised by white faculties to the exclusion of any Negro faculty members. This school is perhaps the outstanding example of non-integration of faculty members.

In the case of Mrs. Gloria Bruse, who lives at 2133 North Kelham, and in the Culbertson Elementary School District, whose 9-year-old daughter, Edwina Hilton, wanted to go to Harmony Elementary School, which was only three blocks away, because of asthma condition, two of her neighbor children, who were white children, transferred from Culbertson Elementary School to Harmony without trouble or difficulty on the basis that they were transferring out of a predominantly Negro school to a predominantly white school, and the Gloria Bruse request to transfer her little Negro girl from Culbertson to Harmony was rejected and denied, and of this situation Mr. Scott was questioned:

"Q And she is colored and they wouldn't accept her transfer on her child from Culbertson to Harmony. Yet all the white neighbors that she has, who are likewise not in the Harmony attendance area, they have got their transfers through.

"A Right.

"Q Can you explain that?

"A I sincerely believe that the interest of the child must be considered in the granting of special transfers. That interest is if that child is unhappy in a situation, his unhappiness is not going to make a contribution to his learning experience, and if he is unhappy then he should be permitted to seek a place where he can be happy.

"Q Well, is this child unhappy?

"A They evidently were or they wouldn't have gone—and I don't mean this sarcastic, but it is proof enough for me that when the parents go to the trouble of going to two different schools perhaps, and coming to my office and saying, 'We would like to change schools,' that I think that is sufficient grounds to feel that they are not happy and are unsatisfied, not satisfied with the atmosphere in which they find themselves; and I feel that they shouldn't be forced to remain in a situation where they are not happy and can't do their best learning.

"Q What do you mean, 'situation they found themselves in'? Going to a school where it was predominantly colored?

"A Yes, sir.

"Q Was that in effect a cause of granting the transfers, because of color?

"A Not because of color.

"Q Because the child—it played some part?

"A Well, I suppose you always have to recognize all the factors. It probably was a factor, but we find children unhappy in schools that are all white schools and permit them to change to another school so they can be happy.

"It's not uncommon at all for children to find themselves involved in difficulty or lack of social acceptance or whatever it is, and they would like to change schools and we believe that they can do a better job if they have a new start."

It can be readily seen that the white children attending Culbertson School, a predominantly Negro school, were readily granted transfers to Harmony, a predominantly white school, while the request for transfer made by the mother of 9-year-old Edwina Hilton, a Negro, from Culbertson School to Harmony School, was denied, although Harmony was closer to her home and the child was suffering from an asthma condition. From the evidence in this case the Court can only conclude, and finds, that the request to transfer Edwina Hilton was denied solely because of race and color, and amounts to unlawful discrimination.

The Court finds and concludes that Robert Dowell's request for transfer from Douglass High School to Northeast High School was denied and refused because of his race and color. The testimony is clear that if he had presented himself originally to Northeast High School he may or may not have been admitted (testimony of Mr. M. J. Burr). The School Board takes the position in answer to the complaint that Robert Dowell had elected Douglass High School as his home school and that he could not transfer from that school without the willingness to take a course in electronics at Northeast High School. That such a requirement is unfair, is unjust and is not in keeping with the policy of the School Board in transfers of white students. Robert Dowell's application to attend Northeast High School for the year 1961–62 should have been granted, and the Court finds that inasmuch as it was not granted, that the Court should now enter an order to the effect that should young Robert Dowell present himself to Northeast High School for school attendance during the year 1963–64 that his presentation and application shall be accepted and that he then and there be enrolled in such courses as he may elect to take as any other student and without any requirements other than the usual requirements placed upon other students in the same class and grade from the school district. It is unescapable from this evidence that the School Board and the school officials, particularly M. J. Burr, did not act in good faith but with a desire to perpetuate a dual school system in requiring this negro boy, and no doubt others similarly situated, to continue his course of study at Douglass, notwithstanding 98 white students in the Douglass area had been transferred to Northeast without any scholastic course requirements whatsoever. In addition, the record is clear that Douglass High School is one of the largest high schools from the standpoint of student attendance in the entire Oklahoma City school system, having an enrollment of 1820, with numerous temporary or portable or classroom facilities as against Northeast High School with a high school enrollment of 1215 students, and there is no evidence of any temporary or portable school facilities at Northeast. It appears that because of the pressure which was placed upon the Superintendent of Schools and the School Board they elected to qualifiedly approve the transfer conditioned upon Robert Dowell's enrolling and taking a course in electronics and pursuing that course diligently, and when he presented himself to Mr. Scott, the principal of Northeast High School, he was denied enrollment, as the Court views it, on the basis that he was wholly unqualified to take the course. If this had been a fact, then it is the belief that Dr. Jack Parker, the Superintendent of Schools, knew this fact even before the Board passed upon the application. Dr. Parker and the Board, having approved the enrollment, it appears to the Court that it then became the duty of Mr. Scott, principal of Northeast High School, to accept the enrollment in good faith and in the spirit of co-operation and to extend to Robert Dowell every assistance possible to encourage and not discourage the student in his new endeavor. But this is not the case. Young Robert Dowell was discouraged to the point of distraction. He is bound to have left Northeast High School with a complete conviction that because of his race he was completely rejected, and the Court is of the belief and opinion that he was rejected solely because of his race.

■ With reference to Vivian C. Dowell, Plaintiff's Exhibit 14 clearly shows that her patron application for transfer from District No. D-45 to District I-89 was never approved by the County Superintendent of Schools and therefore her request for admission is denied as a matter of law. It is noteworthy that Dependent School District 45 did provide a common school for the class and grade below high school for Vivian C. Dowell.

■ The evidence with respect to Gary Russell's request for transfer to Central High School does not indicate the reason for the denial of his request. Furthermore, the Russell boy did not live in the Central High School attendance area, and there is no good cause shown why his request for transfer should have been granted. His request for relief is therefore denied.

■ The next phase of this case is concerned with the special transfer policy of the School Board. The plaintiffs complain that the School Board has followed a practice of nonintegration by permitting and allowing students of elementary, junior high and senior high school to transfer when such students may be attending school wherein their race is in the minority to a school where their race will be in the majority, based solely upon the ground that the student is unhappy in attending the school under such circumstances and transfers will be made when the parents and the School Board believe it would be in the best interest of the student to make such transfer. From the record this is and has been the policy of the School Board at all times since the opinion in the Brown cases, supra, and it is claimed to be based upon the premise that it is for the best interest of the student and the best interest of the school system.

Title 70, O.S.A. Section 4-22 in part provides:

"The board of education of each school district shall have the power to elect its own officers; to make rules and regulations, not inconsistent with the law or rules and regulations of the State Board of Education, * * * to maintain and operate a complete public school system of such character as the board of education shall deem best suited to the needs of the school district; to designate the schools to be attended by the children of the district; * * *."

Acting, no doubt, under the provisions of the above statute, the defendant School Board at a meeting on April 10, 1963 formally adopted a policy with reference to Special Transfers of students. This policy, Defendant's Exhibit 1, is set forth verbatim, as follows:

"The attorney for the District advises that it being necessary, he made the following statement of part of the Board's policy on transfers as follows and asks that this be confirmed or corrected:

" 'It is the policy of the school board to consider, pass upon and to practically always grant the applications of parents for the transfer of their children from schools where the children's race is in the minority to a school or schools solely of the child's race or in which the child's race is in the majority providing that transfers under policy last above described be granted only when it is the opinion of the parents of the child and the district that such transfer is necessary for the best interest of the child as a pupil.'

"The Board finds that this is a fair statement of this portion of the Board's past and present policy, and the Board is advised and believes that this portion of its policy has been so administrated by the personnel but in some cases no clear written record was kept and therefore it is ordered that in the future no special transfer shall be granted unless the reason for the transfer is stated on the application therefore and further that no such transfer shall be granted unless in the opinion of the parent and the proper representative of the district such transfer is neces-

sary for the forwarding of the best interest of the child as a pupil."

The policy set forth in this resolution is the same policy the School Board had followed at all times since 1955. There can be no argument but that such a policy is designed to perpetuate and encourage segregation, and not a good faith effort to integrate the public schools as required by the United States Supreme Court. The Court made it clear that in the field of public education, separate but equal are inherently unequal and hence violates the Constitution. Those school authorities throughout the country who had operated separate schools were instructed to implement desegregation in good faith, with all deliberate speed. The unanimous Court, speaking through Chief Justice Warren, declared that segregation of Negro children, especially in their formative years, "generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone." 347 U.S. 494, 74 S.Ct. 691, 98 L.Ed. 873.

The Court further emphasized the necessity of giving those minority group children the opportunity for extensive contact with other children at an early stage in their educational experience, finding such contact to be indispensable if children of all ages of all races and creeds were to become inculcated with a meaningful understanding of the essentials of our democratic way of life. The benefits inherent in an education in integrated schools are essential to the proper development of all children. The Constitution imposes upon the Board of Education the duty to end segregation in good faith and with deliberate speed. It is patently clear that this obligation has not been fulfilled by the Oklahoma City Board of Education. Since the first Brown case, nine years have passed, and segregation has continued, and on April 10 of this year the policy was reduced to writing, evidencing the plan to continue such segregation of the school children as in the past. This policy is called minority-majority policy.

In Goss v. Board of Education of the City of Knoxville, Tennessee, 373 U.S. ——, 83 S.Ct. 1405, Opinion by Justice Clark, the "minority-majority policy" was unmistakably put at rest. The Court said:

"The claim is that the transfer programs are invalid because they are based solely upon race and tend to perpetuate the pre-existing racial segregation school system. * * * It is readily apparent that the transfer system proposed lends itself to perpetuation of segregation. Indeed the provisions can work only toward that end. While transfers are available to those who choose to attend school where their race is in majority, there is no provision whereby a student might transfer upon request to a school in which his race is in the minority, unless he qualifies for a 'good cause' transfer. * * *

"Classifications based on race for purposes of transfers between public schools, as here, violate the Equal Protection Clause of the Fourteenth Amendment. * * * The recognition of race as an absolute criteria for granting transfers which operate only in the direction of schools in which the transferee's race is in the majority is no less unconstitutional than its use for original admissions or subsequent assignments to the public schools."

See Boson v. Rippey, 285 F.2d 43 (5 Cir.).

The Court further said:

"The alleged equality—which we view as only superficial—of enabling each race to transfer from a desegregated to a segregated school does not save the plans. Like arguments were made without success in Brown, supra, in support of the separate but equal educational program. Not only is race the factor upon which the transfer plan operates, but also the plans lack a provision whereby a student might with equal facilities transfer from a segregated to a desegregated school. The obvi-

ous one-way operation of these two factors in combination underscores the purely racial character and purpose of the transfer provision. We hold that the transfer plans promotes discrimination and are therefore invalid."

█ The assignment or transfer of public school children based in whole or in part upon consideration of their race is unconstitutional, being offensive to the "equal protection" clause of the Fourteenth Amendment. Green v. School Board of City of Roanoke, Virginia (4 Cir.) 304 F.2d 118; Jeffers v. Whittey (4 Cir.) 309 F.2d 621; Wheeler v. Durham City Board of Education (4 Cir.) 309 F.2d 630.

It is abundantly clear from the evidence that the Oklahoma law (70 O.S. 1961, Section 4–22) has been applied by the defendant school board in an unconstitutional manner, so as to perpetuate and maintain, as nearly as possible, racial segregation in the public schools of the defendant school district.

It is therefore the order of this Court that the Oklahoma City Board of Education is ordered to cease and desist its policy of minority to majority, or transfer of students from one school to another school as pronounced in the Board's Resolution of April 10, 1963.

█ This case was tried further upon the question of integration of principals, teachers, clerical, administrative, supervisory, custodial and maintenance employees, and on the charge that they are assigned to buildings and classrooms on the basis of their race and the race of the students that constitute the majority of the student body of the school or schools to which assignments are made, and in this connection the evidence shows that in the Oklahoma City School District there are 101 separate school plants or units. That of this number there are a total of 11 integrated elementary schools and 3 integrated secondary schools. Defendant's Exhibit 2 lists the integrated elementary schools, being 11 in number, showing the number of Negro students and white students, and also names the secondary schools, namely, Central High School, Northeast High School, Star Spencer High School, and lists the number of Negro and white students in each school as shown below:

| NAME OF SCHOOL | MEMBERSHIP | | TEACHERS (CERTIFIED PERSONNEL) |
| --- | --- | --- | --- |
| | NEGRO | WHITE | |
| Bryan | 10 | 67 | 17 |
| Creston Hills | 685–2 | 7 | 20 |
| Culbertson | 1018 | 8 | 25 |
| Edison | 182 | 4 | 5.5 |
| Harmony | 139 | 179 | 10 |
| Lincoln | 456 | 136 | 16.5 |
| Longfellow | 1 | 359 | 12 |
| Orchard Park | 67 | 96 | 8 |
| Polk | 12 | 233 | 9 |
| Riverside | 48 | 140 | 10 |
| Walnut Grove | 138 | 3 | 5.5 |
| Central | 272 | 981 | 62.5 |
| Northeast | 62 | 1177 | 49 |
| Star-Spencer | 145 | 1052 | 49 |

The records show that of the integrated schools, the School Board has employed no Negro principals or Negro teachers during the past nine years except in schools where the student attendance is overwhelmingly Negro students, such as Creston Hills Elementary School, where there are 685 Negro students and

7 white students, and Culbertson Elementary School, where there are 1018 Negro students and 8 white students; Edison Elementary School, where there are 182 Negro students and 4 white students; Orchard Park Elementary School, where there are 139 Negro students and 1 white student and 2 Indian students. On the other hand, the School Board has employed white principals and teachers in schools where there are predominantly Negro students, such as Lincoln Elementary School, where there are 456 Negro students and 136 white students, and not a single Negro has ever been employed as a teacher in this school or Negro personnel of any kind. In Harmony Elementary School, where there are 179 white students and 139 Negro students, the principal and all teachers are white. Not a single Negro teacher or personnel has ever been employed to work in this school. At Central High School, there are 981 white students and 272 Negro students. The principal and all teachers are of the white race. Not a single Negro teacher or school personnel has been employed at this school. The same facts apply at Northeast High School, where there are 1177 white students and 62 Negro students.

Dr. Jack Parker testified that there were approximately 140 temporary or otherwise portable structures used by the School Board in the Oklahoma City school system. That though these are temporary buildings, they are portable so that they may be moved from place to place to satisfy the classroom facilities from time to time and place to place throughout the school system. Douglass, for instance, is a fair example, where there are a number of portable structures maintained by reason of the congested classroom attendance at this school, where there are 1820 students, the largest high school attendance in the Oklahoma City system, as shown by the record. There are four basic principles upon which transfers are granted. Generally speaking, they are:

1. Availability of student classroom space.

2. Where brother and sister may attend the same school.

3. Where the family moves out of one district into another district, the rule is to permit the child or children to continue in the school where they started. Otherwise, the school permits transfers by reason of change of school district.

4. The minority to majority rule or policy.

Dr. Parker testified in regard to integration:

"I think that the reason for this is that any time that something has been in existence since statehood and attitudes have developed over a long period of time, that there must be a transitional period or that there is a transitional period, and that in the beginning for the first two or three years or whatever length of time it might have been, that there was a reason to make it possible for people to become accustomed to the fact that the school district was now a desegregated school district rather than a segregated separate school district, that is with really two separate school systems, so consequently there was given this opportunity to follow the dictates, of the beliefs of the individual person to the degree possible.

"Now in between times there has been a great deal of effort made educationally and otherwise, so that the community and the school district, the patrons of the school district, have become much more accepting of the fact that this is a desegregated school district, to the point that we now can question in each case and make it very definite that each person must demonstrate or that there must be some demonstration of the fact that it is to the best interest of the pupil before such transfers as this are granted."

"Q  Has the education been along the line that the Negro race has certain rights and those must be respected?

"A Yes, sir.

Then Dr. Parker explained that the word "unhappy" has a definite meaning scholastically, as used by principals and teachers, meaning that they are dissatisfied in order to convey to each other that there is something that is getting into the way of the best education for this particular pupil.

As to school personnel, Dr. Parker testified:

"Q We now go to the testimony that was introduced yesterday which would indicate that you have not completely integrated the teaching staff and the personnel of the various schools.

"A All right.

"Q Do you agree that that is a fact?

    \*    \*    \*    \*    \*    \*

"A We have not, that's true.

"Q Will you state to the Court why the Board has not? First, who makes that decision?

"A The Board makes that decision, in conjunction—

"Q With whom does the Board discuss the matter before it makes the decision?

    \*    \*    \*    \*    \*

"A They discuss it with me, as Superintendent.

"Q Are your opinion and the Board's opinion and ideas identical on this matter?

"A Yes, sir.

"Q State your reasons for non-integration.

"A The responsibility of the Board of Education and I as their agent is to provide the best education possible for the school children of Oklahoma City, of the Oklahoma City School District. This we are trying to do to our utmost ability.

"We recognize also that we are to operate a desegregated school system from the standpoint of the pupils. Each decision that I make and each decision that the Board makes, with my advice, is made with the hope that it will be the best decision possible so far as quality of instruction in the school system is concerned.

"As we have considered this matter of whether or not teacher staffs of the various schools should be integrated, I have advised the Board and have concluded that nothing would be gained educationally by a desegregation of staffs and that as a matter of fact, the appointment of Negro teachers in certain schools and the mixing of staffs could very well detract from the quality of the instructional program in Oklahoma City; and that there would be only one reason that I could think of for doing this, and it would not be an educational reason. It would be merely for the sake of integration and we feel, that is the Board of Education and myself feel, that this is not sufficient cause because our responsibility is primarily an educational responsibility, for making the decision to desegregate the staffs of the various schools.

"Q Is this decision made in any degree upon the fact that you feel that Negro teachers are not equal to white teachers?

"A *No, sir, not at all.*"

The Court finds and concludes from the evidence that the School Board has not acted in good faith in its efforts to integrate the Oklahoma City Public Schools, as defined and required in the Brown cases, as to pupils and personnel. Nine years now have passed since the segregation laws of Oklahoma were declared unconstitutional and void; eight years since the School Board passed its Resolution to integrate. Following the integration resolution of August 1, 1955, certain formerly all-white schools have been converted over to all-Negro schools, and some white and Negro schools. The

old Negro schools before the Brown case have grown in student enrollment until now the old Negro schools are so crowded and congested that there is not adequate room to properly operate the schools. The school children and personnel have in the main from all of the evidence been completely segregated as much as possible under the circumstances, rather than integrated as much as possible. Inasmuch as the Superintendent of Schools has established the proof necessary that Negro teachers are equal in quality to the white teachers, it seems only reasonable and fair that in all schools, mixed or otherwise, the School Board would and should make a good faith effort to integrate the faculty, in order that both white and Negro students would feel that their color was represented upon an equal level and that their people were sharing the responsibility of high-level teaching. That the feeling of a Negro student predominant in the school in his own race being denied as his principal and/or teacher brings this Court to the conclusion that the statement made by the Honorable Earl Warren is here most appropriate, wherein he declared that segregation of Negro children, especially in their formative years, "generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone." To me, to send Negro children, as in the case of Lincoln School, to a white principal and all-white teachers would be a deterrent to the Negro students not having before them Negro teachers who are as well qualified as whites to set an example to them of integration. The Court concludes from all of the evidence that the time has come for the Oklahoma City School Board to begin the integration of its teaching staff, and it will be so ordered.

The Court, in considering the complaint that the Oklahoma City Board of Education is guilty of gerrymandering insofar as Douglass High School and its feeder junior high school and elementary school areas are concerned, and other schools, finds that evidence of ger-

rymandering or otherwise of maintaining separate and distinct schools for Negroes and schools for whites can be seen in a review of the testimony. The Court will only recite such portion as reflects the almost total segregation of its schools.

Arthur Boyd, Negro, principal of Creston Hills Elementary School, testified that he has under his supervision 20 Negro teachers and no white teachers, and 695 Negro students and 2 white students.

Delbert Burnett, Negro, principal of Culbertson Elementary School, testified that he has under his supervision 25 Negro teachers and no white teachers, and that his school has an enrollment of 1067, of which 1064 are Negro students and 3 are white students.

Floyd Alexander, Negro, principal of Moon Junior High School, testified that he has under his supervision 46 Negro teachers and no white teachers, and that there are 1444 Negro students enrolled and no white students.

Bert Watkins, Negro, principal of Dunbar Elementary School, testified that he has under his supervision 25 Negro teachers and no white teachers, and 925 Negro students and no white students.

Anderson J. Lonian, Negro, principal of Edwards Elementary School, testified that he has under his supervision 14 Negro teachers and no white teachers, and 462 Negro students enrolled and no white students.

Mrs. Hazel Horn, Negro, Superintendent of Carver Elementary School, testified that she has under her supervision 17½ Negro teachers and no white teachers, and 665 Negro students and no white students.

R. D. Hall, Negro, principal of Page Elementary School, testified that he has under his supervision 19 Negro teachers and no white teachers, and that he has 651 Negro students enrolled and no white students.

Mrs. Mary Moulder, Negro, principal of Harry S. Truman Elementary School, testified that she has under her super-

vision 21 Negro teachers and no white teachers, and 675 Negro students enrolled, and no white students.

Miss Ruby Dabney, Negro, principal of Orchard Park Elementary School, testified that she has under her supervision 5 Negro teachers and no white teachers, and 139 Negro students and one white student and 2 Indian students.

Mrs. Ruby Fleming, Negro, principal of Woodson Elementary School, testified that she has under her supervision 22 Negro teachers, and no white teachers, and 755 Negro students enrolled and no white students.

O. M. McDaniels, Negro, principal of Douglass High School, testified that he has under his supervision 71 Negro teachers and no white teachers. That he had 42 teaching stations on the campus, 29 in the main building and 9 in the vocational building, 3 in the physical education building and one under the stadium. That he had 15 portable or temporary buildings, or a total of 57 teaching stations. That he had enrolled 1821 Negro students and no white students.

The foregoing data establishes the fact that there is no integration but practically complete segregation in the aforementioned schools. Mr. Burr testified that the Oklahoma City School System had special transfers numbering from four to five thousand each year, and it is fair to assume that a good portion of the four or five thousand special transfer students each year have been transferred out of and from the aforementioned elementary, junior and high school areas, thus making these areas for all practical purposes totally segregated. What part, if any, gerrymandering may have played in the operation of practically totally segregated schools referred to is problematical. It is believed that once the Oklahoma City School Board establishes in good faith a policy of transfer based upon scholastic reasons alone and eliminates entirely transfers based in whole or in part upon race that the Oklahoma City Schools will begin the desegregation

policy demanded by the Supreme Court in the Brown cases. There is insufficient evidence before the Court to find there has been gerrymandering of the Negro school districts as of this date, and the matter of gerrymandering of necessity is a matter of which proof will be heard at some early date. Since August 1, 1955, the only integration has been in the fringe areas as between minority Negro residential pattern and the majority white residential pattern. For instance, there are 14 elementary and secondary schools that have some degree of integration, out of 101 school plants. However, the redistricting of schools has meant little or nothing in view of the policy "minority to majority," and as long as this policy is continued there will never be a good faith desegration and integration of the public schools of the Oklahoma City district. It is interesting indeed to note some of the things the Oklahoma City School Board has not done to bring about a good faith, orderly and timely integration. For instance, the evidence is void of any effort on the part of the Oklahoma City School Board to engage an expert who is familiar with the problem of integration, as was done in the Rochelle case, Taylor v. Board of Education, New Rochelle, New York, D.C., 191 F.Supp. 181, where the School Board employed experts in the field of segregation to analyze and advise on the matter of integration. It will be noted that the Mayor and the Oklahoma City Council do, from time to time, employ traffic experts to advise in the field of traffic controls and regulations, which is a far less important task than the one confronting the Oklahoma City School Board of integration for the good and benefit of all children. There is no evidence showing that the Oklahoma City School Board has ever at any time appointed a group of outstanding Negro citizens to consult and advise with concerning the problem of integration as has recently been done by Mayor Jack Wilkes, in appointing a committee to consult and advise with reference to integration in the local business establishments, which thus far as

of this date has proved to be of great peaceful advantages.

From a study of the evidence in this case, the Court concludes that the Oklahoma City School Board has followed a course of integration as slowly as possible. Our Negro people, business, religious and educational leaders have so far as this record is concerned been completely ignored, and it is their rights that are at long last before this Court.

One of the basic foundations of America's strength, and one of the keys to its greatness, is the right to have equal public schools for all our children. The right of each American child to enjoy free, equal schools. If any white child were denied such right all would be indignant; why not let it be so with our Negro children.

Based upon the foregoing Findings of Fact and Conclusions of Law, the Court enters the following

ORDER AND DECREE

1. That should Robert Dowell present himself as a student at Northeast High School for the school term beginning September, 1963, he shall be enrolled in classes and study courses commensurate with his grade and standing as a student, without being required to enroll in any course of study other than that required for other students in said Northeast High School.

2. The complaint and requested relief of Vivian C. Dowell is denied.

3. The complaint and requested relief of Gary Russell is denied.

4. The defendant School Board of Oklahoma City, Oklahoma, Independent District No. 89, and the individual defendants named, are hereby permanently restrained and enjoined from continuing or pursuing the policy commonly referred to as "minority to majority," said policy being hereby held to be unconstitutional, void and unenforceable, and such practice and policy shall no longer be pursued by the defendants, or any of them.

5. It is further decreed that there shall be no special transfers from one school to another, except in cases based solely upon scholastic study requirements or other valid good-faith reasons, but in no case based in whole or in part on race or color.

6. The School Board of the City of Oklahoma City, Independent District No. 89, and all of its officers and agents, are ordered to establish a policy of integrating supervisory and teaching staffs, in good faith, and with deliberate speed, commencing with the school year beginning in September 1963. In this connection, the Court would normally call upon the School Board to show cause why there should not be faculty integration, as well as pupil integration. However, from the testimony of the School Superintendent, Dr. Jack Parker, it is evident that the defendants do not intend to integrate the supervisory or teaching faculty. Dr. Parker testified: "There would be only one reason that I think of for doing this, and this would not be an educational reason. It would merely be for the sake of integration, and we feel, that is the Board of Education and myself feel, that it is not sufficient cause because our responsibility is primarily an educational responsibility. * * *" He further testified:

"Q    Is this decision made in any degree upon the fact that you feel that Negro teachers are not equal to white teachers?

"A    *No, sir, not at all.*"

7. Hereafter the defendants are ordered to keep and maintain full and complete records of all transfers made from dependent school districts into the defendant school district, and full and complete records of all special transfers from school to school within the district, specifically showing the race or color of each student and the specific reason or reasons for each transfer, until further order of this Court.

8. The defendant School Board is ordered to file with the Clerk of this Court, within a period of ninety (90) days from this date, a complete and comprehensive plan for the integration of the Oklahoma

City school system, both as to the student body and teaching and supervisory personnel. Additional time may be allowed on application and proper showing.

9. It is further the decree of this Court that the defendant school district shall, within ninety (90) days from this date, file with the Clerk of this Court the basis, and all pertinent information, used or adopted in the formation of the respective school attendance areas, elementary, junior and senior high school areas, insofar only, however, as this information pertains to the Douglass High School attendance area, Central High School area and Northeast High School area, to the end that the Court may determine whether such attendance areas are set up and created in good faith or whether gerrymandering has been practiced in the formation of such attendance areas.

The Court shall retain full and complete jurisdiction over this cause to assure full and complete compliance with this Decree, and to make such further orders and decrees as justice and equity may require.