8 F.3d 1501
 87 Ed. Law Rep. 67
 Robert L. DOWELL, an infant under the age of 14 years who
sues by A.L. DOWELL, his father as next friend,
Plaintiff-Appellant,
Vivian C. Dowell, a minor, by her father A.L. Dowell, as
next friend; Edwina Houston Shelton, a minor, by her
mother, Gloria Burse; Gary Russell, a minor, by his father,
George Russell; Stephen S. Sanger, on behalf of himself and
all others similarly situated; Yvonne Monet Elliot and
Donnoil S. Elliot, minors, by their father Donald Elliot;
Diallo K. McClarty, a minor, by his mother Donna R.
McClarty; Donna Chaffin and Floyd Edmun, minors, by their
mother Glenda Edmun; Chelle Luper Wilson, a minor, by her
mother Clara Luper; Donna R. Johnson, Sharon R. Johnson,
Kevin R. Johnson and Jerry D. Johnson, minors, by their
mother Betty R. Walker; Lee Maur B. Edwards, a minor, by
his mother Elrosa Edwards; Nina Hamilton, a minor, by her
father Leonard Hamilton; Jamie Davis, a minor, by his
mother Etta T. Davis; Romand Roach, a minor, by his mother
Cornelia Roach, on behalf of themselves and all other
similarly situated black children and parents or guardians
of black children, Plaintiffs-Intervenors-Appellants,
v.
The BOARD OF EDUCATION OF the OKLAHOMA CITY PUBLIC SCHOOLS,
INDEPENDENT DISTRICT NO. 89, OKLAHOMA CITY, OKLAHOMA, a
Public Body Corporate; Jack F. Parker, Superintendent of
the Oklahoma City, Oklahoma Public Schools; M.J. Burr,
Assistant Superintendent of the Oklahoma City, Oklahoma
Public Schools; Melvin P. Rogers; Phil C. Bennett;
William F. Lott; Mrs. Warren F. Welch; Foster Estes,
Members of the Board of Education of Oklahoma City Schools,
Independent District No. 89, Oklahoma County, Oklahoma;
William C. Haller, County Superintendent of Schools of
Oklahoma County, Oklahoma, Defendants-Appellees,
Jenny Mott McWilliams, a minor, and David Johnson
McWilliams, a minor, sue by William Robert McWilliams, their
father and next friend, on behalf of themselves and all
others similarly situated; Renee Hendrickson, a minor,
Bradford Hendrickson, a minor, Teresa Hendrickson, a minor,
Cindy Hendrickson, a minor, who sues by Donna P.
Hendrickson, as mother and next friend of each of said
minors, and Donna P. Hendrickson, individually, for
themselves and all others similarly situated,
Defendants-Intervenors-Appellees,
David Webster Verity, a minor by and through his next
friend, George L. Verity; George L. Verity, and Ellen
Verity, for themselves and all others similarly situated;
Taejemo Danzie, a minor, by and through Mrs. A.J. Danzie,
her next friend; Mrs. A.J. Danzie, for themselves and all
others similarly situated, Intervenors.
 Nos. 91-6407, 92-6046.
 United States Court of Appeals,
Tenth Circuit.
 Nov. 4, 1993.
 
 Janell M. Byrd, Washington, DC (Lewis Barber, Jr. of Barber & Marshall, Oklahoma City, OK, Julius L. Chambers and Norman J. Chachkin, New York City, and John W. Walker, Little Rock, AR, with her on the brief), for plaintiffs-appellants.
 Charles J. Cooper (Micheal W. Kirk, also of Shaw, Pittman, Potts & Trowbridge, Washington, DC, and Laurie W. Jones of Fenton, Fenton, Smith, Reneau & Moon, Oklahoma City, OK, with him on the brief), for defendants-appellees.
 Before LOGAN, McWILLIAMS, and SEYMOUR, Circuit Judges.
 LOGAN, Circuit Judge.
 
 
 1
 Plaintiffs, Oklahoma City schoolchildren and their parents, appeal the district court's termination of the decree requiring defendant Oklahoma City Board of Education[1] to adopt and implement a comprehensive desegregation plan, and its dismissal of the case.
 
 
 2
 The facts and procedural history of this case have been discussed extensively in prior opinions of this court and the district court. See Dowell v. Board of Educ., 890 F.2d 1483 (10th Cir.1989), rev'd 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991);[2] Dowell v. Board of Educ., 795 F.2d 1516 (10th Cir.), cert. denied, 479 U.S. 938, 107 S.Ct. 420, 93 L.Ed.2d 370 (1986); Dowell v. Board of Educ., 778 F.Supp. 1144 (W.D.Okla.1991); Dowell v. Board of Educ., 677 F.Supp. 1503 (W.D.Okla.1987); Dowell v. Board of Educ., 606 F.Supp. 1548 (W.D.Okla.1985). This effort began in 1961 when plaintiffs filed suit in the Western District of Oklahoma, seeking equitable relief against defendant for operating a state-compelled dual educational system. Despite the district court's 1963 finding that defendant had intentionally segregated its schools, Dowell v. School Bd., 219 F.Supp. 427 (W.D.Okla.1963), it was not until 1972 that defendant was finally required to implement the desegregation decree (the Finger Plan), Dowell v. Board of Educ., 338 F.Supp. 1256 (W.D.Okla.1972), the modification of which is now before us.
 
 
 3
 The Finger Plan, instituted during the 1972-73 school year, restructured Oklahoma City's attendance zones to create racial balance at all grade levels except kindergarten. It adopted a feeder system for the high schools and middle schools, so that student assignments were based on the elementary school attendance zone in which the student resided. Desegregation of the elementary grades was accomplished by converting all schools with primarily white students to serve only grades one through four, and converting all schools with primarily black students into fifth-year centers with enhanced facilities and curricula. In grades one through four, black students were bused to schools in white residential areas and white students attended their neighborhood schools. White fifth graders were bused to fifth-year centers located in black residential areas, and black fifth graders attended the centers in their neighborhoods. Kindergarteners attended their neighborhood schools or any other school their parents found more convenient. Schools located in racially balanced neighborhoods were accorded "stand-alone" status, and enrolled grades kindergarten through fifth. No elementary school students in an integrated attendance zone were bused in or out.
 
 
 4
 Defendant sought to close this case in 1975, claiming that it had eliminated all vestiges of de jure segregation in its schools and that it was operating a unitary system. The district court entered a finding of unitariness in January 1977, but did not vacate or modify its 1972 decree mandating implementation of the Finger Plan. Dowell, No. CIV-9452, slip. op. (W.D.Okla. Jan. 18, 1977). This order was not appealed. However, defendant continued to operate its schools in conformity with the Finger Plan until 1985. At that time, defendant abandoned the elementary school portion of the Finger Plan and introduced the student reassignment plan (SRP).
 
 
 5
 Under the SRP, instituted in the 1985-86 school year and still in effect, defendant returned to neighborhood schools for kindergarten through fourth grade. Fifth-year centers are located throughout the district, rather than just in black residential areas, but busing continues for all students above the fourth grade.[3] Furthermore, the SRP created an equity officer and committee to monitor the quality of facilities, equipment, supplies, and instructors throughout the school system and to recommend other means of integrating racially identifiable elementary schools. Finally, the SRP includes a majority-to-minority transfer policy, so that elementary students assigned to schools where their race is in the majority can transfer to a school in which their race is in the minority. Transportation is provided.
 
 
 6
 Defendant's stated purpose in implementing these changes was to address demographic shifts in Oklahoma City and the long term consequences of the Finger Plan, which was originally designed for a school district that was only twenty percent minority.[4] Although defendant appears not to have adhered strictly to the stand-alone feature of the Finger Plan, at the beginning of 1985 there were thirteen schools being considered for stand-alone status. If all of these stand-alone schools had been created, travel for black children in grades one through four living in the northeast quadrant of the city would have become more burdensome. In addition, these stand-alone schools, which enrolled fifth graders, would have decreased the number of children attending the enriched fifth-year centers, causing school closures in black neighborhoods and curricular inequities for fifth graders at stand-alone schools. Defendant was also concerned about decreased parental participation, which it attributed to the absence of neighborhood schools. Plaintiffs object to the SRP because it dramatically increased the number of elementary schools that were more than ninety percent black or more than ninety percent non-black.
 
 
 7
 Thus, in response to defendant's abandonment of the Finger Plan, plaintiffs moved to reopen the case to challenge the constitutional validity of the SRP. After a two-day hearing the district court denied the motion to reopen, concluding that the 1977 finding of unitariness was res judicata, that the school district was still unitary as of 1985, and that neighborhood schools are not in and of themselves unconstitutional. This court reversed and remanded, holding that the district court erred in failing to reopen the case and in reaching the merits of the SRP's constitutionality without permitting plaintiffs the opportunity to present evidence. Dowell, 795 F.2d 1516. We concluded that although the 1977 finding of unitariness was binding, the order terminating active supervision of the case did not dissolve the mandatory injunction. Id. at 1520-21. On remand, the district court was to determine "whether the original mandatory order will be enforced or whether and to what extent it should be modified." Id. at 1523.
 
 
 8
 Thereafter, in 1987 the district court held an eight-day hearing on the merits of the SRP. Under instructions from this court, the burden was on the defendant to "present evidence that changed conditions require modification or that the facts or law no longer require the enforcement of the order." Id. Defendant produced evidence that the Finger Plan had become oppressive, and that the current pattern of residential segregation in Oklahoma City was unrelated to the previous de jure system. Plaintiffs offered their interpretation of the changing demographics, the impact of the SRP, and defendant's emphasis on an Effective Schools program, increased parental involvement, and equity supervision.
 
 
 9
 The district court found that after the original decision in the case defendant had taken "absolutely no action ... caus[ing] or contribut[ing] to the patterns of the residential segregation which presently exist in areas of Oklahoma City." Dowell, 677 F.Supp. at 1512. According to the district court, Oklahoma City had reached the point at which the relationship between past segregation and present segregation had become "so attenuated as to be incapable of supporting a finding of de jure segregation warranting judicial intervention." Keyes v. School Dist. No. 1, 413 U.S. 189, 211, 93 S.Ct. 2686, 2698, 37 L.Ed.2d 548 (1973). The district court agreed with defendant that the operation of the Finger Plan had become inequitable, and further held that since 1977 defendant had maintained its unitary status according to the factors identified in Green v. County Sch. Bd., 391 U.S. 430, 435, 88 S.Ct. 1689, 1692, 20 L.Ed.2d 716 (1968). Dowell, 677 F.Supp. at 1515-16. Although the elementary schools under the SRP are not racially balanced, the district court found that this was not enough to support a finding the school district was no longer unitary and that there was no evidence defendant returned to neighborhood schools for intentionally discriminatory reasons.
 
 
 10
 Following guidelines developed by the Supreme Court in the antitrust context, the district court found that the purposes of the 1972 decree had been achieved. Having dismantled the dual system and having proved substantially changed conditions, defendant was entitled to dissolution of the decree. Plaintiffs were free to seek appropriate remedies, the district court said, if they could prove a new constitutional violation. Id. at 1522.
 
 
 11
 This court by a divided panel vacated and remanded the district court's decision. Dowell, 890 F.2d 1483. We held that the proper inquiry for modification or vacation of equitable relief is "whether the changes are so important that dangers, once substantial, have become attenuated to a shadow." Id. at 1490 (quoting United States v. Swift & Co., 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932)). Because defendant had a continuing obligation to desegregate, we addressed whether the SRP maintains the district's unitary status. We concluded that although defendant had been declared unitary, the changed circumstances established in the record were not sufficient to show that the threat of a dual system had disappeared. Id. 890 F.2d at 1493. Thus we held that the district court had erred in dissolving the decree, and we remanded the case to the district court to conduct an evidentiary hearing regarding alternatives to the SRP, to modify the Finger Plan to accommodate changed circumstances, and to retain jurisdiction to supervise these assignments. Id. at 1506.
 
 
 12
 The Supreme Court granted defendant's petition for certiorari and reversed our decision. Dowell, 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991). The Supreme Court rejected our analysis under Swift, concluding that
 
 
 13
 a finding by the District Court that the Oklahoma City School District was being operated in compliance with the commands of the Equal Protection Clause of the Fourteenth Amendment, and that it was unlikely that the Board would return to its former ways, would be a finding that the purposes of the desegregation litigation had been fully achieved. No additional showing of "grievous wrong evoked by new and unforeseen conditions" is required of the Board.
 
 
 14
 Id. 498 U.S. at 247, 111 S.Ct. at 636. Emphasizing the temporary nature of desegregation decrees, the Court instructed the district court on remand to examine whether defendant had complied with the decree in good faith, and "whether the vestiges of past discrimination had been eliminated to the extent practicable." Id. at 250, 111 S.Ct. at 638. In so doing, the district court was to consider all of the Green factors, and to make a res nova finding on whether present residential segregation was in fact a vestige of de jure school segregation. Finally, if the district court once again determined that defendant was entitled to dissolution of the decree, it should then consider plaintiffs' challenge to the SRP under appropriate equal protection principles. Id.
 
 
 15
 Upon reexamination of the record from the 1987 hearings concerning whether defendant was entitled, as of 1985, to return to neighborhood schools, the district court reaffirmed its prior findings. Dowell, 778 F.Supp. 1144 (W.D.Okla.1991). It is from this decision that plaintiffs now appeal.
 
 
 16
 Plaintiffs argue that the district court erred in a number of ways: (1) it should have allowed plaintiffs an evidentiary hearing and additional discovery on remand; (2) it should have granted plaintiffs relief from judgment under Fed.R.Civ.P. 60(b); (3) its adoption of defendant's proposed findings is entitled to less deference than usual and indicates that it failed to conduct a res nova review of residential segregation in Oklahoma City; (4) it erred in concluding that defendant had complied with the decree in good faith; (5) it erred in concluding that the vestiges of prior discrimination had been eliminated to the extent practicable; and (6) it erred in finding that the SRP was adopted without discriminatory intent. We address these contentions seriatim.
 
 
 17
 * The Supreme Court instructed the district court on remand to decide "whether the Board made a sufficient showing of constitutional compliance as of 1985, when the SRP was adopted, to allow the injunction to be dissolved." Dowell, 498 U.S. at 249, 111 S.Ct. at 637. Plaintiffs' argument with the district court's interpretation of its remand instructions is two-fold. First, they contend that the district court could not have properly addressed this question on the basis of the record formed in response to our remand instructions in 1986. Those instructions required the district court to determine whether "the law or the underlying facts have so changed that the dangers prevented by the injunction have become attenuated to a shadow, and the changed circumstances have produced hardship so extreme and unexpected as to make the decree oppressive." Dowell, 795 F.2d at 1521 (citation and internal quotations omitted). Because of these differing instructions, plaintiffs claim certain factual matters crucial to answering the Supreme Court's mandate were not adequately developed. Second, they maintain that the district court selectively considered post-1985 evidence.
 
 
 18
 The terms of the Supreme Court's remand neither required nor prohibited additional hearings, thus leaving the matter to the district court's discretion. We therefore review the district court's refusal to allow evidentiary hearings on remand for an abuse of that discretion. See, e.g., Hicks v. Gates Rubber Co., 928 F.2d 966 (10th Cir.1991) (when remand is general district court is free to decide matters not foreclosed by mandate); Otero v. Mesa County Sch. Dist. No. 51, 628 F.2d 1271, 1272 (10th Cir.1980) (district court could refuse to reopen case and receive additional evidence on remand when appellate court mandate required new findings). The decision to reopen discovery is also left to the district court's discretion. Sil-Flo, Inc. v. SFHC, Inc., 917 F.2d 1507, 1514 (10th Cir.1990).
 
 
 19
 Here the district court was emphatic that despite the differences between our 1986 mandate and the Supreme Court's most recent instructions, "the parties had a full and fair opportunity to present any evidence concerning whether the 1972 decree should be dissolved." Dowell, 778 F.Supp. at 1152. This included evidence regarding defendant's good faith compliance with the Finger Plan, all of the Green factors as directed by the Supreme Court, and defendant's handling of all grade levels. Further, the district court declared that the 1987 hearings addressed the defendant's good faith and intent in adopting the SRP. Id. at 1154. Satisfied that the evidence already before it was sufficient to respond to the Supreme Court's remand, the district court acted within its discretion in declining to reopen discovery or conduct additional hearings.
 
 
 20
 We are also persuaded that the district court did not misinterpret the scope of its review on remand. Its instructions were to decide whether defendant "made a sufficient showing of constitutional compliance as of 1985." Dowell, 498 U.S. at 249, 111 S.Ct. at 637. The district court correctly concluded that evidence from the period following the adoption of the SRP was irrelevant to this inquiry. This did not result, as plaintiffs assert, in the district court selectively relying on post-1985 evidence in deciding to dissolve the decree. On the contrary, the district court correctly noted that its determination of defendant's good faith compliance with the Finger Plan as of 1985 could not be influenced by events following the adoption of the SRP. Dowell, 778 F.Supp. at 1158 n. 28. The district court's subsequent discussion of post-adoption evidence as corroborative of defendant's nondiscriminatory motives in adopting the SRP, id. at 1188 n. 73, 1189 n. 74, 1191 n. 76, related to a different issue, and was not inappropriate. See Village of Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 266, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977) ("Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of official action--whether it bears more heavily on one race than another--may provide an important starting point.") (citation and internal quotations omitted).
 
 II
 
 21
 Plaintiffs contend that the district court should have granted them relief from judgment under Fed.R.Civ.P. 60(b). We review the district court's denial of such relief for an abuse of discretion. Pelican Prod. Corp. v. Marino, 893 F.2d 1143, 1145 (10th Cir.1990). "[O]nly if we find a complete absence of a reasonable basis and are certain that the district court's decision is wrong do we reverse." Id. at 1147.
 
 
 22
 Although on appeal plaintiffs appear to have dropped their plea for relief under Rule 60(b)(5), we observe that the district court's decision does not have the prospective effect that subsection of the rule requires. See Lee v. Talladega County Bd. of Educ., 963 F.2d 1426, 1433 (11th Cir.1992) (order freeing school district from court supervision does not have prospective application for Rule 60(b)(5) purposes); Twelve John Does v. District of Columbia, 841 F.2d 1133, 1138-39 (D.C.Cir.1988) (judgment from which relief is sought under Rule 60(b)(5) must have prospective effect, in that it is executory or involves supervision of changing conduct or conditions).
 
 
 23
 Plaintiffs also fail to make the more compelling showing of extraordinary circumstances required for relief under Rule 60(b)(6). See Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 863-64, 108 S.Ct. 2194, 2204, 100 L.Ed.2d 855 (1988); Ackermann v. United States, 340 U.S. 193, 200-02, 71 S.Ct. 209, 212-13, 95 L.Ed. 207 (1950). Although this court has recognized that Rule 60(b)(6) is the appropriate mechanism for addressing a change in the law subsequent to the entry of final judgment, Wilson v. Al McCord Inc., 858 F.2d 1469, 1478 (10th Cir.1988), our rationale for granting relief under this rule was that without the benefit of the change in the law, the parties might not have developed essential aspects of the record. Id. at 1479. We have determined that the district court did not abuse its discretion in finding that the Supreme Court's remand instructions, although substantially different from our earlier mandate, could be followed without supplementing the 1987 record. Therefore, we conclude here that whatever change in the law was created by the Supreme Court's remand did not harm plaintiffs in their ability to present their case to the district court. Plaintiffs failed to show extraordinary circumstances, and the district court was within its discretion in denying relief from judgment.
 
 III
 
 24
 Plaintiffs allege, and we agree, that the district court adopted verbatim large portions of defendant's proposed findings of fact. This does not mean that we afford the district court's findings any less deference. The Supreme Court has held that although a trial judge may be criticized for his wholesale adoption of the prevailing party's findings of fact, nevertheless "even when the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous." Anderson v. City of Bessemer City, 470 U.S. 564, 572, 105 S.Ct. 1504, 1510, 84 L.Ed.2d 518 (1985). This court has remanded for additional findings when the district court's decision followed the proposed language of the prevailing party. Everaard v. Hartford Accident & Indem. Co., 842 F.2d 1186, 1193 (10th Cir.1988). However, we recognized that Anderson requires a clearly erroneous standard of review, and we remanded not for "the district court's outright adoption of the plaintiff's conclusions" but for "the total absence of a reasoned analysis" for the court's decision. Id. Here plaintiffs do not allege and cannot show that the findings are so deficient that no meaningful review is possible or so facially defective that they cannot survive review for clear error. Further, the Supreme Court has recognized the special role of the district court in school desegregation cases, particularly when the district judge has "lived with the case over the years." Columbus Bd. of Educ. v. Penick, 443 U.S. 449, 457 n. 6, 99 S.Ct. 2941, 2946 n. 6, 61 L.Ed.2d 666 (1979).
 
 
 25
 Plaintiffs also argue that because the district court's findings on the issue of residential segregation were adopted from defendant's proposed findings, and because the district court made certain remarks plaintiffs believe indicated prejudgment of this issue, the court failed in its duty to conduct a res nova review of residential segregation in Oklahoma City. The district court understood the res nova instruction to mean that it should reexamine residential segregation "as if it had not been decided before, reconsidering and reweighing all of the evidence in the record." Dowell, 778 F.Supp. at 1154. Although we do not approve of the district court's verbatim adoption of defendant's proposed findings, its extended discussion of this issue, see id. at 1160-1172, and the fact we here find that its conclusions are supported by the record, precludes us from finding that it failed to conduct res nova review or committed clear error. Further, we conclude that the few colorable comments by the district judge plaintiffs cite as indicating prejudgment of the residential segregation issue are nothing more than his expressions of frustration at the seemingly interminable life of this litigation. There is no credible evidence of bias or prejudgment.
 
 IV
 
 26
 The Supreme Court's remand order in Dowell required the district court to decide "whether the Board made a sufficient showing of constitutional compliance as of 1985 ... to allow the injunction to be dissolved." 498 U.S. at 249, 111 S.Ct. at 637. The district court was to address the board's good faith compliance with the desegregation decree since it was entered, and whether the vestiges of past discrimination had been eliminated "to the extent practicable." Id. at 249-50, 111 S.Ct. at 637-38. If the board was entitled to termination of the decree as of 1985, the district court was then to evaluate the decision to implement the SRP under "appropriate equal protection analysis." Id. at 250, 111 S.Ct. at 638. The district court found for defendant on all these issues. Plaintiffs challenge these findings as clearly erroneous.
 
 
 27
 We note three major principles the Supreme Court has emphasized in Dowell and Freeman v. Pitts, --- U.S. ----, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992), which both guide and confine our analysis of the merits.
 
 
 28
 The Supreme Court in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (Brown I ), stated that "[s]eparate educational facilities are inherently unequal," and that segregating black school children "may affect their hearts and minds in a way unlikely ever to be undone," id. at 494, 74 S.Ct. at 691. This language could lend itself to a conclusion that where different races co-exist in the district, one-race schools, or even racially unbalanced schools, are unconstitutional under the Fourteenth Amendment, without regard to whether someone was at fault in the ordinary legal sense.
 
 
 29
 The Supreme Court, however, has never abandoned the traditional legal principle that relief is available only against persons or entities that society would label as responsible for the wrong. Thus, to determine a school board's liability for segregated schools or residential segregation affecting school attendance, the court must find the school board's actions were a "contributing cause." Columbus Bd. of Educ. v. Penick, 443 U.S. 449, 465 n. 13, 99 S.Ct. 2941, 2950 n. 13, 61 L.Ed.2d 666 (1979) (residential segregation is a vestige of de jure school segregation if the school board's actions were a "contributing cause" of residential segregation); Keyes v. School Dist. No. 1, 413 U.S. 189, 211, 93 S.Ct. 2686, 2698, 37 L.Ed.2d 548 (1973) (school board must show "that its past segregative acts did not create or contribute to the current segregated condition of the core city schools"). Once under a court injunction to desegregate, the desegregation injunction must be dissolved once the school board meets its "burden of showing that any current imbalance is not traceable, in a proximate way, to the prior violation." Freeman, --- U.S. at ----, 112 S.Ct. at 1447. Under the mandate in the instant case the district court was required to "address itself to whether the Board had complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable." Dowell, 498 U.S. at 249-50, 111 S.Ct. at 637-38 (footnote omitted).
 
 
 30
 Second, consistent with the Supreme Court's view that education is not a fundamental right protected by the federal Constitution, see San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 17-44, 93 S.Ct. 1278, 1288-1302, 36 L.Ed.2d 16 (1973), is the imperative that federal control of the schools should be relinquished to local authorities as soon as possible. "[F]ederal supervision of local school systems was intended as a temporary measure to remedy past discrimination." Dowell, 498 U.S. at 247, 111 S.Ct. at 636. "[T]he court's end purpose must be to remedy the violation and in addition to restore state and local authorities to the control of a school system that is operating in compliance with the Constitution." Freeman, --- U.S. at ----, 112 S.Ct. at 1445. "Returning schools to the control of local authorities at the earliest practicable date is essential to restore their true accountability in our governmental system." Id.[5]
 
 
 31
 Last is the constitutional irrelevance of school attendance patterns themselves unless they were caused by unremedied past segregation or by more recent school district conduct in unremedied areas of the school system that contributed to the racial imbalance. "That there was racial imbalance in student attendance zones was not tantamount to a showing that the school district was in noncompliance with the decree or with its duties under the law. Racial balance is not to be achieved for its own sake." Id. --- U.S. at ----, 112 S.Ct. at 1447.[6]
 
 V
 
 32
 We turn now to plaintiffs' challenge of the district court's finding that defendant "had complied in good faith with the desegregation decree since it was entered." Dowell, 498 U.S. at 249-50, 111 S.Ct. at 637-38. Because a decree may be perpetuated if there is a continuing danger of unlawful activity, id. at 247, 111 S.Ct. at 636, good faith compliance requires a finding not only that the school district "was being operated in compliance with the commands of the Equal Protection Clause of the Fourteenth Amendment, [but also] that it was unlikely that the school board would return to its former ways." Id. Under the first prong of this analysis, we examine whether defendant operated its schools in good faith conformity with the Equal Protection Clause from the time it implemented the Finger Plan until it adopted the SRP in 1985.[7]
 
 
 33
 We are strongly persuaded by the numerous occasions on which the federal courts at all levels, and even the plaintiffs, have agreed that defendant complied with the provisions of the Finger Plan. See, e.g., 498 U.S. at 249, 111 S.Ct. at 637 ("the Board complied with the decree in good faith until 1985"); Dowell, 890 F.2d at 1486 ("the Board maintained the District under the Finger Plan[ ] ... even after the district court declared the District unitary and terminated the case"); Dowell, 677 F.Supp. at 1522 (commenting on "the school district's continued adherence to the fundamental tenets of the Finger Plan at all grade levels through school year 1984-85"); Plaintiff's Brief to the Supreme Court, Appellees' App. at 562 ("the injunction was followed in every respect for eight years until it was unilaterally abandoned with regard to the elementary grades in 1984").
 
 
 34
 We recognize that, as late as 1976, the district court found that defendant had "acted in bad faith at all stages of this litigation." Dowell, 71 F.R.D. 49, 58 (W.D.Okla.1976). Nonetheless, as a matter of law, we are bound by the pronouncement of the Supreme Court in this case that the importance of returning schools to local control requires the district court to "[d]issolv[e] a desegregation decree after the local authorities have operated in compliance with it for a reasonable period of time." Dowell, 498 U.S. at 248, 111 S.Ct. at 637. The determination of compliance for a reasonable period of time must proceed on a case-by-case basis. However, we note that other courts have relinquished jurisdiction based on records and periods of compliance similar to defendant's. See Riddick v. School Bd., 784 F.2d 521 (4th Cir.) (school district found unitary in 1975 and in compliance through 1983 permitted to reintroduce neighborhood schools), cert. denied, 479 U.S. 938, 107 S.Ct. 420, 93 L.Ed.2d 370 (1986); Spangler v. Pasadena City Bd. of Educ., 611 F.2d 1239, 1243 (9th Cir.1979) (Kennedy, J. concurring) ("The Board was in substantial compliance with the plan for the period 1970-1974. It was in total compliance during the period 1974-1976 ... and there has been no showing of noncompliance in any degree since that date."). Based on our reading of the record in this case, we conclude that the district court did not clearly err in finding no credible evidence of bad faith on the part of the board since 1976,[8] and we hold that good faith compliance from 1977 to 1985 was good faith compliance for a reasonable period of time. See Dowell, 778 F.Supp. at 1157.
 
 
 35
 The second prong of the good faith inquiry is whether it is "unlikely that the school board would return to its former ways." Dowell, 498 U.S. at 247, 111 S.Ct. at 636. In Freeman, the Supreme Court explained that "[a] school system is better positioned to demonstrate its good-faith commitment to a constitutional course of action when its policies form a consistent pattern of lawful conduct directed to eliminating earlier violations." --- U.S. at ----, 112 S.Ct. at 1446. We have since interpreted the good faith showing set out in Freeman to mean that "[m]ere protestations of an intention to comply with the Constitution in the future will not suffice. Instead, specific policies, decisions, and courses of action that extend into the future must be examined to assess the school system's good faith." Brown v. Board of Educ., 978 F.2d 585, 592 (10th Cir.1992); see also Morgan, 831 F.2d 313, 321 ("[U]nitariness is less a quantifiable 'moment' in the history of a remedial plan than it is the general state of successful desegregation."); Lemon v. Bossier Parish Sch. Bd., 444 F.2d 1400, 1401 (5th Cir.1971) ("One swallow does not make a spring.").
 
 
 36
 On remand, the district court appears to have relied heavily on the statements of school officials in determining the board's unlikeliness to return to its former ways. Dowell, 778 F.Supp. at 1159-60. We give these potentially self-serving statements less weight than did the district court. Rather, in keeping with our most recent Brown decision, we look to future-oriented board policies manifesting a continued commitment to desegregation.[9] The district court discussed several such policies, and although it presented these features of the SRP to show the board's lack of discriminatory intent, id. 778 F.Supp. at 1189-90, we conclude that they also serve as indicators of affirmative efforts to maintain desegregation in the future. The SRP continued the Finger Plan's majority-to-minority transfer option. It introduced a Student Interaction Plan, which paired schools with significant black populations and schools with significant white populations for periodic joint activities. It established an Equity Committee and an Equity Officer to monitor facilities and equipment throughout the district and assure their equal distribution among the elementary schools.[10] Finally, under the SRP the district continued its affirmative action plan for faculty. This evidence supports the district court's conclusion that at the time it adopted the SRP, the board, through its policies, showed sufficient recognition of its continuing obligation to maintain a unitary school district. Accordingly, we cannot hold clearly erroneous the district court's determination that defendant has succeeded in proving its good faith compliance.
 
 VI
 
 37
 The Supreme Court's remand order also conditioned termination of the desegregation decree on the district court's finding that "the vestiges of past discrimination had been eliminated to the extent practicable." Dowell, 498 U.S. at 250, 111 S.Ct. at 638. To that end, the district court was instructed to conduct a res nova review of residential segregation in Oklahoma City, and to examine "every facet of school operations--faculty, staff, transportation, extra-curricular activities and facilities." Id. (quoting Green, 391 U.S. at 435, 88 S.Ct. at 1692). Plaintiffs maintain that the district court applied the wrong legal standard and that none of the four bases on which the district court relied can support its conclusion that any residential segregation which lingered as a vestige of de jure school segregation has been eliminated to the extent practicable, and that the district court erred in finding that school locations and faculty segregation were not vestiges of prior discrimination.
 
 
 38
 * We trace the term "vestiges of prior discrimination" to the Supreme Court's landmark decision in Green v. County Sch. Bd., 391 U.S. 430, 437-38, 88 S.Ct. 1689, 1693-94, 20 L.Ed.2d 716 (1968), which first imposed upon school authorities "the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch" and obligated district courts to "retain jurisdiction until it is clear that state-imposed segregation has been completely removed." Id. at 439, 88 S.Ct. at 1694. The Court went on in Green to identify six different facets of school operations in which racial identification might be manifested. Id. at 435, 88 S.Ct. at 1692. The "root and branch" metaphor for the objective of desegregation was formalized in Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971), as the obligation of the school authorities "to eliminate from the public schools all vestiges of state-imposed segregation."
 
 
 39
 In Swann, the Supreme Court recognized the synergy between segregated schools and segregated housing patterns. There the Court held that school board decisions concerning new construction and school closings in de jure segregated school districts "may well promote segregated residential patterns which, when combined with 'neighborhood zoning,' further lock the school system into the mold of separation of the races." Id. at 21, 91 S.Ct. at 1278. Similarly, in Keyes, the Court observed that student assignment and school construction policies, in conjunction with other policies that "have the clear effect of earmarking schools according to their racial composition ... may have a profound reciprocal effect on the racial composition of residential neighborhoods within a metropolitan area, thereby causing further racial concentration within the schools," 413 U.S. at 202, 93 S.Ct. at 2694, and that "common sense dictates the conclusion that racially inspired school board actions have an impact beyond the particular schools that are the subjects of those actions." Id. at 203, 93 S.Ct. at 2695. However, despite broad language in Keyes suggesting a long remedial reach for the federal courts--"that a connection between past segregative acts and present segregation may be present even when not apparent and that close examination is required before concluding that the connection does not exist," id. at 211, 93 S.Ct. at 2698--the Swann decision itself contains the limits of an inquiry into the lingering effects of de jure discrimination on residential patterns.[11]
 
 
 40
 At some point, these school authorities and others like them should have achieved full compliance with this Court's decision in Brown I. The systems would then be "unitary" in the sense required by our decisions in Green and Alexander.
 
 
 41
 It does not follow that the communities served by such systems will remain demographically stable, for in a growing, mobile society, few will do so. Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system. This does not mean that federal courts are without power to deal with future problems; but in the absence of a showing that either the school authorities or some other agency of the State has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools, further intervention by a district court should not be necessary.
 
 
 42
 402 U.S. at 31-32, 91 S.Ct. at 1283-84. In effect, "at some point in time the relationship between past segregative acts and present segregation may become so attenuated as to be incapable of supporting a finding of de jure segregation warranting judicial intervention." Keyes, 413 U.S. at 211, 93 S.Ct. at 2698.
 
 
 43
 In Freeman, the Supreme Court held that this relationship between past and present segregation is attenuated as a matter of law when the school district can show that current racial imbalances in school population are "not traceable, in a proximate way, to the prior violation." --- U.S. at ----, 112 S.Ct. at 1447. The constitutional significance of single race schools turns on whether the school board is culpable for the segregation.
 
 
 44
 Where resegregation is a product not of state action but of private choices, it does not have constitutional implications. It is beyond the authority and beyond the practical ability of the federal courts to try to counteract these kinds of continuous and massive demographic shifts. To attempt such results would require ongoing and never-ending supervision by the courts of school districts simply because they were once de jure segregated. Residential housing choices, and their attendant effects on the racial composition of schools, present an ever-changing pattern, one difficult to address through judicial remedies.
 
 
 45
 In one sense of the term, vestiges of past segregation by state decree do remain in our society and in our schools. Past wrongs to the black race, wrongs committed by the State and in its name, are a stubborn fact of history. And stubborn facts of history linger and persist. But though we cannot escape our history, neither must we overstate its consequences in fixing legal responsibilities. The vestiges of segregation that are the concern of the law in a school case may be subtle and intangible but nonetheless they must be so real that they have a causal link to the de jure violation being remedied. It is simply not always the case that demographic forces causing population change bear any real and substantial relation to a de jure violation. And the law need not proceed on that premise.
 
 Id. at ----, 112 S.Ct. at 1448.[12]
 
 46
 The Supreme Court has provided little guidance for determining the legal significance of lingering segregation. In fact, the Supreme Court has "never sought to describe how one identifies a condition as the effluent of a violation, or how a 'vestige' or a 'remnant' of past discrimination is to be recognized." Freeman, --- U.S. at ----, 112 S.Ct. at 1451 (Scalia, J., concurring). Cf. Dowell, 498 U.S. at 260-61, 111 S.Ct. at 643-44 (Marshall, J., dissenting) ("Although the Court has never explicitly defined what constitutes a 'vestige' of state-enforced segregation, the function that this concept has performed in our jurisprudence suggests that it extends to any condition that is likely to convey the message of inferiority implicit in a policy of segregation.").
 
 
 47
 Although recognizing a vestige is no simple matter, certain features of this inquiry are clear. A court examining a school district for vestiges of past discrimination should, following Green, review all facets of school operations. The six factors enumerated in Green are not exhaustive;[13] each situation must be studied individually to determine the various places and ways in which racial discrimination has been manifested in the past. Once these loci with the school system are identified, the court must ascertain whether the hallmarks of racial identifiability still remain. Finally, the court must undertake the difficult task of determining whether the school board has proved that the racial identifiability present in an aspect of school operations is not causally connected to prior de jure segregation. The import of Freeman is that "[o]nce the racial imbalance due to the de jure violation has been remedied, the school district is under no duty to remedy imbalance that is caused by demographic factors." --- U.S. at ----, 112 S.Ct. at 1447. The passage of time alone does not erase racial imbalance as a vestige of prior de jure discrimination. District courts must examine the causal chain carefully to see whether the defendant school board has played a role in creating "what are now self-perpetuating patterns of residential segregation." Dowell, 498 U.S. at 265, 111 S.Ct. at 646 (Marshall, J., dissenting).
 
 B
 
 48
 After conducting its res nova review of residential segregation in Oklahoma City, the district court found four independent bases for concluding that the vestiges of de jure school segregation had been eliminated to the extent practicable. The district court found: that current housing patterns in Oklahoma City are the result of the private choices of whites and blacks; that the pattern of residential segregation in Oklahoma City today is so different from the original pattern of residential segregation that the former cannot be considered a vestige of official segregation; and that neither past nor present patterns of residential segregation were caused by de jure school segregation in any significant way and thus the board is not responsible for providing a remedy. Alternatively, the district court found that because the board cannot redress residential segregation in Oklahoma City, "any such residential segregation that might be considered a vestige of former de jure school segregation has in any event been eliminated 'to the extent practicable.' " Dowell, 778 F.Supp. at 1171.
 
 
 49
 We review the district court's findings of fact for clear error; and when the district court's resolution of an issue depends primarily on its assessment of expert testimony, "[w]e are loath to disturb a finding based upon such conflicting evidence." An-Son Corp. v. Holland-America Ins. Co., 767 F.2d 700, 702-03 (10th Cir.1985). We review the district court's application of legal standards de novo, of course.
 
 
 50
 The district court heard volumes of expert testimony and made extensive findings of fact on this issue. It recited the evidence for seven pages in its opinion, which we will not repeat here. See Dowell, 778 F.Supp. at 1160-67; see also Dowell, 677 F.Supp. at 1506-13. Although the district court's determination predated Freeman, we believe it applied the proper legal standard. Its findings and conclusions amount to a causal link inquiry in which defendant met its burden of proving attenuation. This follows from the district court's determination that residential segregation in Oklahoma City today results from individuals making private choices in response to economic and social forces over which the school board had no control. We must, therefore, uphold the district court's determination regarding causation.
 
 
 51
 Based on the record, the district court did not err in finding that, as legal barriers to integrated housing were removed and civil rights legislation was enacted, many black residents of Oklahoma City were able to leave the east inner city area to which they had previously been confined. Further, the district court could properly credit the testimony of defendant's expert that the residential segregation that remains in Oklahoma City is attributable to economic factors, personal preferences, social and neighborhood relationships, and private discrimination. By way of refutation, plaintiffs offer little more than the contrary evidence presented by their experts. It goes without saying that a clearly erroneous standard of review "plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently.... Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson, 470 U.S. at 573-74, 105 S.Ct. at 1511.
 
 
 52
 The district court was also entitled to interpret its prior findings regarding the causes of residential segregation as it did. In the early years of this litigation, the district court stated on several occasions that residential segregation in Oklahoma City was not attributable to defendant. Dowell, 307 F.Supp. 583, 594 (W.D.Okla.1970) ("[t]he Board did not originate patterns of residential racial segregation"); Dowell, 244 F.Supp. 971, 975 ("Negroes in Oklahoma City reside in certain definite areas, which areas were designated as such originally by virtue of state law and were continued through the general use of restrictive covenants."); Dowell, 219 F.Supp. at 433 ("[t]he residential pattern of the white and Negro people in the Oklahoma City school district has been set by law for a period in excess of fifty years"). Although the district court had also previously observed that a neighborhood schools policy "superimposed over already existing residential segregation ... leads inexorably to continued school segregation," 244 F.Supp. at 976, the district court here did not clearly err in finding that this observation related to the court's rejection of the neighborhood schools policy as a remedy for de jure segregation, not to its explanation of the causes of residential segregation. See Dowell, 778 F.Supp. at 1169 n. 44.
 
 
 53
 We must hold that the district court did not clearly err in finding that residential segregation in Oklahoma City today is not traceable in a proximate way to defendant's earlier constitutional violation, and therefore is not a "vestige." Consequently we do not address the district court's conclusion that insofar as current residential segregation is a vestige of past discrimination it has been eliminated to the extent practicable.
 
 C
 
 54
 Plaintiffs also argue that the location of schools within Oklahoma City perpetuates the dual school system, and that faculty resegregation followed shortly after defendant abandoned the elementary school portion of the Finger Plan, resulting in less experienced and less qualified teachers at predominantly black schools.
 
 
 55
 Plaintiffs maintain that the location of schools was part of the original dual system in Oklahoma City, and that school construction following Brown I reinforced that dual system. Upon closer examination however, plaintiffs' arguments regarding school locations simply revisit the issue of residential segregation. Board policies regarding school locations were not part of the constitutional violation explicitly addressed in the original decree. Nonetheless, it is undisputed that before the Finger Plan was implemented, defendant used new school construction, school closings, and selective enforcement of the neighborhood schools policy to perpetuate segregated schooling. See Dowell, 244 F.Supp. at 975-77. However, while the Finger Plan was in effect the location of the schools was no longer material because reconfigured attendance zones and busing neutralized the effect of schools having been built to serve only one race. Plaintiffs do not allege that school construction during the operation of the Finger Plan was segregative in intent or effect, or that attendance zones under the SRP have been gerrymandered to increase segregation. Plaintiffs are correct that because blacks and whites continue to live separately in much of Oklahoma City, neighborhood schools serving their children will not necessarily be integrated. It is equally clear that because many blacks today live in or near the same sections of Oklahoma City that formed the heart of the black neighborhood in the 1950s and 1960s, and because many schools from that era are still in use, some schools that had been predominantly black before the Finger Plan are now predominantly black under the SRP. Nevertheless, the reemergence of single race schools under the SRP is a consequence of where people live, not where the schools are located.
 
 
 56
 The district court was also correct in finding that the faculty of the Oklahoma City school system was integrated as of 1985. Plaintiffs do not contest that the school district had met its goals for faculty integration; their only contention here is that following the adoption of the SRP, the board and the Oklahoma City Federation of Teachers entered into an agreement providing for faculty transfers based on seniority that had the effect of resegregating the faculties of some schools. We return, once again, to the district court's mandate from the Supreme Court in this case. The sole issue for consideration is "whether the Board made a sufficient showing of constitutional compliance as of 1985, when the SRP was adopted, to allow the injunction to be dissolved." 498 U.S. at 249, 111 S.Ct. at 637. Thus, the school board's agreement with the teachers' union is outside the scope of this inquiry.[14]
 
 
 57
 The district court did not err in finding that defendant had complied in good faith with the decree from the time it was entered until 1985, and that the vestiges of past discrimination had been eliminated to the extent practicable. Therefore, its order dissolving the decree must be affirmed.
 
 VII
 
 58
 Because defendant was entitled to have the decree dissolved as of 1985, we must now review whether its decision to discontinue busing for students in grades one through four violates the Equal Protection Clause. Dowell, 498 U.S. at 250, 111 S.Ct. at 638. We may reverse the district court's finding of no discriminatory intent only if it is clearly erroneous. Pullman-Standard v. Swint, 456 U.S. 273, 289-90, 102 S.Ct. 1781, 1790-91, 72 L.Ed.2d 66 (1982).
 
 
 59
 Discriminatory intent cannot be inferred from disparate impact alone. As we have related, de facto segregation in the schools, without more, does not violate the Fourteenth Amendment. Plaintiffs must prove not only that defendant's actions created or maintained racial imbalance in the schools, but also that those actions were motivated by segregative intent. See Keyes, 413 U.S. at 208, 93 S.Ct. at 2697; Dayton Bd. of Educ. v. Brinkman, 433 U.S. 406, 420, 97 S.Ct. 2766, 2775, 53 L.Ed.2d 851 (1977) (Dayton I ); see also Personnel Adm'r v. Feeney, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979) (discriminatory purpose implies that decisionmaker "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group"); Washington v. Davis, 426 U.S. 229, 242, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976) ("Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution."). Plaintiffs do not have to prove that the decision rested solely on racially discriminatory grounds, only that it was a motivating factor. Arlington Heights, 429 U.S. at 265-66, 97 S.Ct. at 563.
 
 
 60
 "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Id. at 266, 97 S.Ct. at 563. In conducting this inquiry into discriminatory intent, we examine the impact of the official action, the historical background of the action, the sequence of events leading up to the challenged decision, any departures from the normal decisionmaking process, and any legislative or administrative history including contemporaneous statements by members of the decisionmaking body. Id. at 266-68, 97 S.Ct. at 563-65. Plaintiffs contest the district court's conclusions with respect to several of these avenues of inquiry. Primarily, they maintain that, aside from the SRP's impact on the racial composition of the elementary schools in Oklahoma City, the district court took inadequate account of the long history of the school board's intentional discrimination against black school-children, of statements by board members allegedly indicating discriminatory intent, and of the board's choice of the SRP over other possible student assignment plans.
 
 
 61
 Although plaintiffs are certainly correct that the Oklahoma City School Board has an ugly history, plaintiffs' arguments linking that history to intentional discrimination in the present depend on their interpretation of the district court's 1965 opinion. Plaintiffs claim that the SRP is, in all relevant aspects, a resurrection of the neighborhood schools plan that the board adopted following Brown I, and that that neighborhood plan was part and parcel of the de jure system. However, even assuming that the SRP and the post-Brown neighborhood schools policy are identical and that reintroduction of that plan thirty years later would establish discriminatory intent, plaintiffs are incorrect that the original neighborhood schools policy was itself constitutionally infirm. The district court's 1965 opinion establishes only that such a policy was insufficient to address the long history of deliberate residential and school segregation in Oklahoma City.[15]
 
 
 62
 Similarly, the district court did not clearly err in its assessment of school board members' stated reasons for adopting the SRP. The district court found that the board's reasons for abandoning busing in grades one through four included addressing the inequities created by continued application of the Finger Plan, increasing parental and community involvement in the schools, improving education and extracurricular programs in the elementary schools, and alleviating the negative effects of busing on younger children. Dowell, 778 F.Supp. at 1187-91. Further, even if we assume, as do plaintiffs, that the board was motivated in part by white parents' antipathy toward busing,[16] this does not establish discriminatory intent. The district court's conclusions regarding intent are further supported by its findings describing several features of the SRP that were designed to preserve the desegregated nature of the school system as much as possible. The district court interpreted these efforts as indicating that the board was committed to maintaining a unitary school system and refuting any inference of invidious intent. Id. at 1189-90. Although this court has criticized the subsequent effectiveness of these measures, see Dowell, 890 F.2d at 1500-02, we have never implied, nor do we here, that the board intended failure from the outset.
 
 
 63
 Finally, the district court reviewed the school board's procedure in selecting the SRP over other student assignment options that may have had a less segregative impact. It concluded that the board did not prejudge the issue, that it entertained a number of solutions to problems with the Finger Plan, that it encouraged community participation throughout the decisionmaking process, and that there was support for neighborhood schools within the black community. Plaintiffs argue that the board's invidious intent was manifested in its failure to take other measures, such as grade restructuring, boundary changes, and magnet schools. However, under Davis and Arlington Heights the board is not obligated to make the least segregative choice, and the impact of the SRP standing alone does not establish a discriminatory motive. To the extent the district court's findings depended on credibility determinations, we must defer to that court's ability to make those judgments. In sum, we conclude that the district court did not err in finding that the SRP was not adopted with discriminatory intent.
 
 VIII
 
 64
 In conclusion, we must acknowledge that this case is primarily about busing. From the quoted and other pronouncements of the Supreme Court, we understand the law to be this: Even when current residential segregation originated in laws and private contracts enforced by the courts and supported by local school board policies, once the school board has implemented a constitutionally acceptable desegregation plan, and has for some considerable time distributed black students throughout the school system more or less in their proportion to the total student population, then changes in attendance zones that alter the racial makeup of the schools are no longer constitutionally significant if the school board establishes that the changes were made for valid reasons unrelated to discrimination.
 
 
 65
 Because state and local laws imposing segregation are unconstitutional and racial covenants are unenforceable, there is no longer any legal impediment to population movement. By redistributing students in a manner designed to desegregate, and by maintaining that posture for some period and avoiding taking other actions that tend to create racially identifiable schools, school boards can exonerate themselves from fault for racially segregated housing patterns. The fact that residential segregation continues, and that neighborhood schools may be predominantly one race, is no longer considered traceable to the school board, but rather is viewed as the result of individual choices and socioeconomic forces.
 
 
 66
 It is clear from the record developed through the long history of this case that the current housing patterns in Oklahoma City originated with de jure segregation which helped create and perpetuate a social and economic underclass of black people. Although legal impediments have been removed and blacks, with the aid of civil rights laws, have made many economic and social gains, private discrimination remains and many blacks continue to comprise an economic underclass. No doubt many blacks choose to live in predominantly black inner-city neighborhoods. But it also seems clear that the many blacks who remain poorer than most of the white population cannot afford to move, and when they do move it is to nearby neighborhoods, to homes vacated by white residents fleeing to residential areas that many blacks cannot afford. The result is that poor blacks remain concentrated in urban neighborhoods, where both the housing stock and the public school buildings are older and frequently substandard.
 
 
 67
 Despite all this, if a school board has complied in good faith with a desegregation decree and eliminated the vestiges of prior discrimination in its schools, it is not responsible in a "proximate way" for continued segregated housing patterns. Because court supervision over schools must be temporary and the return to local control is imperative, once the vestiges of prior segregation attributed to the school board have been eliminated, then the school board is entitled to be released from the court's injunction. That was the result reached by the district court in the instant case. We cannot hold its fact findings were clearly erroneous, nor can we say that it misconstrued the applicable law. Therefore, we affirm its judgment.[17]
 
 
 68
 The Oklahoma City School District was in compliance with the Constitution as of 1985 and the board is no longer under the supervision of the federal court. It goes without saying that the school board is still obliged to obey the mandate of the Fourteenth Amendment in administering its schools. After more than thirty years, this case is closed. Any further complaints of racial discrimination in the Oklahoma City school system will have to be brought by new litigation.
 
 
 69
 AFFIRMED.
 
 
 
 [1]
 Defendants include not only the Oklahoma City Board of Education but the board members, the county superintendent, the school district superintendent and assistant superintendent. Because all are sued in their official capacities and the objective is to force action by the school board, throughout this opinion we use the singular "defendant" as representative of the school board or all defendants collectively
 
 
 [2]
 In this opinion we refer to numerous prior Dowell v. Board of Education decisions: one in the Supreme Court, two in the court of appeals (the case has been to the Tenth Circuit seven times now), and eight reported and one unreported decisions of the district court. To avoid unnecessary repetition hereafter we will identify all reported former decisions simply as Dowell followed by the appropriate citation
 
 
 [3]
 Beginning in the fall of this year the board will eliminate the fifth year centers entirely and reassign fifth graders to neighborhood schools
 
 
 [4]
 In 1971, 23.4% of the 68,840 public school students in Oklahoma City were black. By 1985, the number of public school students had dropped to 40,375, 38.3% of whom were black
 
 
 [5]
 We note, however:
 If there were not some discretion lodged in a desegregation court to attempt in a modest and limited way to assure that the attainment of long sought for goals was not illusory and ephemeral, the entire exercise, into which so many had invested so much, could well prove to have been a painful charade.
 Morgan v. Burke, 926 F.2d 86, 91 (1st Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1664, 118 L.Ed.2d 386 (1992).
 
 
 [6]
 In his separate concurrence in Freeman, Justice Souter emphasized that before releasing a school district from judicial supervision, the district court must make specific findings that there is no relationship between "past school segregation" and "[r]acial imbalance in student assignments caused by demographic change." Freeman, --- U.S. at ----, 112 S.Ct. at 1454. The other separate concurrences emphasize the duty of the school board to prove that its own policies did not contribute directly to the racial imbalance in the schools. Id. at ----, 112 S.Ct. at 1457 (Blackmun, Stevens and O'Connor, concurring in the judgment). We do not read the majority opinion in Freeman to disagree with these statements
 
 
 [7]
 The Supreme Court specifically focused the inquiry into good faith compliance on the period following the implementation of the Finger Plan. Dowell, 498 U.S. at 249, 111 S.Ct. at 637. The Supreme Court's express instructions preclude us from considering the board's adoption of the SRP as a breach of good faith. Id. at 249 n. 1, 111 S.Ct. at 637 n. 1
 
 
 [8]
 Plaintiffs suggest that we can infer from the presence in 1980 of board members who had served continuously from as early as 1972 that the school board remained recalcitrant after the district court's 1976 finding of bad faith. We have already determined that the district court did not err in finding that the board's intent was fully litigated in 1987, and in refusing to hold additional hearings on this issue, see supra Part I. Thus plaintiffs' mere recitation of certain board members' years of service, without more, cannot now create an inference of continued bad faith. Plaintiffs also urge that earlier deviations from the stand-alone provisions of the Finger Plan are sufficient to establish noncompliance. However, the district court maintained, and we agree, that
 if Plaintiffs had ever truly believed a significant violation of the 1972 decree had occurred, they certainly would have brought it before this court to seek enforcement of the decree, as they did regarding the SRP. But quite to the contrary, Plaintiffs up until now have all but conceded good-faith compliance and implementation of the 1972 decree, apart from the SRP.
 Dowell, 778 F.Supp. at 1159.
 
 
 [9]
 Although we held in Brown that a court's evaluation of good faith "is not limited to an individual facet" of a school system, but must "consider the system's efforts to desegregate, as a whole, across time," 978 F.2d at 592, by the Supreme Court's mandate we may "not treat the adoption of the SRP as a breach of good faith on the part of the Board." Dowell, 498 U.S. at 249 n. 1, 111 S.Ct. at 637 n. 1
 
 
 [10]
 We realize that previously we have ruled these features of the SRP were inadequate to "ameliorate the condition created by the Plan, the emergence of ... one-race schools." Dowell, 890 F.2d at 1502. However, at that juncture we were evaluating the effectiveness of these features as they were implemented in the years immediately following the adoption of the SRP, an inquiry we are prohibited from conducting in determining the board's good faith compliance as of 1985. All we can do here is acknowledge that the board included programs within the SRP aimed at maintaining a unitary system, even if those programs failed to achieve their goal. Also, we must take into account the Supreme Court's pronouncement in Freeman that the emergence of one-race elementary schools is not necessarily an evil that must be counteracted if the school board proves that the racial system is not "traceable, in a proximate way, to the prior violation." Freeman, --- U.S. at ----, 112 S.Ct. at 1447. Our concern here is whether in adopting the SRP, the board showed a concrete commitment to continuing desegregation beyond "[m]ere protestations of an intention to comply with the Constitution in the future." Brown, 978 F.2d at 592
 
 
 [11]
 We observe, for the sake of clarity, that we are concerned with residential segregation as a vestige of de jure school segregation only insofar as such segregation produced effects in the schools. See Swann, 402 U.S. at 20-21, 91 S.Ct. at 1278. It is undisputed that the SRP, by returning to a residence-based method of student assignment, created a significant number of one race schools. Further, although we are precluded by the terms of the Supreme Court's remand from examining the SRP as it was implemented, we have no doubt that defendant knew what its effects on the racial composition of the schools would be
 
 
 [12]
 In Justice Souter's separate concurrence in Freeman, he stated that when "demographic change toward segregated residential patterns is itself caused by past school segregation and the patterns of thinking that segregation creates," such change "is not an independent, supervening cause of racial imbalance in the student body." Freeman, --- U.S. at ----, 112 S.Ct. at 1454. We do not understand that statement to disavow the proximate traceability analysis required by the majority opinion, in which Justice Souter also joined
 
 
 [13]
 Keyes mentioned as relevant, "administrative attitudes toward the school," 413 U.S. at 196, 93 S.Ct. at 2691; Freeman added "quality of education," --- U.S. at ----, 112 S.Ct. at 1437
 
 
 [14]
 We note, however, as did the district court, that plaintiffs admitted in their brief to the Supreme Court that "the faculties at all grade levels are currently fully integrated." Brief for Respondents at 31 n. 21, Board of Educ. v. Dowell, 498 U.S. at 247, 111 S.Ct. at 637 (1991)
 
 
 [15]
 Therefore, plaintiffs' preliminary argument, based on Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), also fails. If the neighborhood schools were not themselves a constitutional violation, then, under Mt. Healthy, the board need not rationalize their reintroduction through the SRP
 
 
 [16]
 Plaintiffs here rely on cross examination testimony by then board president, Susan Hermes, establishing primarily that the board was reacting to public opposition to busing. Mrs. Hermes did not directly testify that these complaints came from white parents: those were the words of the attorney conducting the cross examination
 
 
 [17]
 Justice Scalia apparently believes that it will be an unusual case in which the school board is able to meet its burden that it is not responsible for the continuing racial imbalance
 Only in rare cases such as this one and [Pasadena City Bd. of Educ. v.] Spangler, [427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976) ] ... where the racial imbalance had been temporarily corrected after the abandonment of de jure segregation, can it be asserted with any degree of confidence that the past discrimination is no longer playing a proximate role. Thus, allocation of the burden of proof foreordains the result in almost all of the "vestiges of past discrimination" cases.
 Freeman, --- U.S. at ----, 112 S.Ct. at 1452 (Scalia, J., concurring). Our affirmance in this case will not help other school systems where the methods of desegregating did not involve massive busing and did not even temporarily fix the problem.